IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:17-cv-00073-MR

HERRMANN INTERNATIONAL, INC. and )
HERRMANN GLOBAL, LLC, )
                                                                                             Plaintiffs,   )
)
vs.                                       )         **O R D E R**
)
HERRMANN INTERNATIONAL EUROPE, )
HERRMANN TECHNOLOGIE, BRAIN )
RESSOURCES, and LIONEL MARC )
VUILLEMIN, )
)
                                        Defendants.   )

**THIS MATTER** is before the Court on the Defendants' Motion to Dismiss for Lack of Jurisdiction. [Doc. 16].

**I.   STANDARD OF REVIEW**

Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge. The plaintiff, however, bears the burden of demonstrating personal jurisdiction at every stage following such a challenge. Grayson v. Anderson, 816 F.3d 262, 267 (4th Cir. 2016) (citing Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). "[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter." Grayson, 816 F.3d at 267 (citation omitted).

When, as here, a district court considers a question of personal jurisdiction based on the allegations of a complaint, motions papers, affidavits, and supporting memoranda, the plaintiff has the burden of making a prima facie showing in support of its assertion of jurisdiction. Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014), cert. denied, --- U.S. ---, 135 S.Ct. 2860 (2015); Grayson, 816 F.3d at 268. In deciding whether the plaintiff has met this burden, "the district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Universal Leather, 773 F.3d at 558 (internal quotation marks and citation omitted). If the existence of jurisdiction turns on disputed factual questions and a prima facie showing of personal jurisdiction has been made, a district court can proceed as if it has personal jurisdiction over the matter, although factual determinations to the contrary may be made at trial.[1] Public Impact, LLC v. Boston Consulting Group, Inc., 117 F.Supp.3d 732, 736 (M.D.N.C. Aug. 3, 2015) (citations omitted).

---

[1] The parties presented many disputed facts for the Court's review in determining this motion. Much of these facts, however, go to the merits of the parties' controversy and not to whether personal jurisdiction lies under the applicable standard of review. The Court specifically notes that the Ruling of the Commercial Court of Versailles submitted by Defendants by way of a Notice of Supplemental Authority [Doc. 21] does not lend any support to Defendants' position within the framework the Court is to operate in deciding the current motion.

"Nevertheless, either at trial or at a pretrial evidentiary hearing, the plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence." Id. at 737 (citing New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 n. 5 (4th Cir. 2005)).

II. **FACTUAL AND PROCEDURAL BACKGROUND**

Viewing the pleadings and affidavits in the light most favorable to the Plaintiffs, the following is a summary of the relevant facts. Plaintiffs Herrmann International, Inc. ("HI") and Hermmann Global, LLC ("HG") are North Carolina corporations with principal places of business in Rutherford County, North Carolina. [Doc. 18-1 at ¶¶ 3, 4]. HI and HG are professional services companies in the business of providing assessments of cognitive, behavioral, and personality traits for education, business management training, and leadership development. The assessments are "based on brain research and the use of data generated by those assessments and other research." [Id.]. HG owns the intellectual property developed by HI. [Id. at ¶ 4]. HI and HG are herein collectively referred to as Plaintiffs. Before 2011, HI was known variously as The Ned Herrmann Group, Inc., Whole Brain Corporation, and Applied Creative Services. [Id.].

Defendants Herrmann International Europe ("HIE"), Herrmann Technologie ("HT"), and Brain Ressources are French companies organized

3

and registered under the laws of France. They have no offices, facilities or employees in the State of North Carolina. [Doc. 1 at ¶¶ 3, 4, 5; Doc. 17-16 at ¶ 13]. Defendants HIE and HT have conducted business with Plaintiffs as licensees of Plaintiffs' suite of intellectual property and proprietary information. [Doc. 1 at ¶¶ 4, 5]. Defendant Brain Ressources develops applications in the field of education using Herrmann products and services. [Doc. 17-1 at ¶ 27]. Defendant Lionel Marc Vuillemin ("Vuillemin") is a resident of France. [Id. at ¶ 6]. Vuillemin is the president of HIE and HT and "controls" Brain Ressources. [Id.]. Plaintiffs contend that Vuillemin regularly conducted business with Plaintiffs in North Carolina on behalf of HIE and HT and for the benefit of himself personally, HIE, HT, and Brain Ressources. [Doc. 1 at ¶ 6]. Plaintiff alleges Defendant Brain Ressources is "affiliated with Defendants HIE, HT and [ ] Vuillemin, and has participated and conspired with them in the acts described [in the Complaint]." [Id. at ¶ 5].

Plaintiffs and their predecessors have operated for more than 35 years. [Id. at ¶ 5]. Beginning in the early 1960s, Ned Herrmann pioneered the field of brain research as it relates to business management and performance. [Doc. 18-1 at ¶ 6]. Mr. Herrmann is the father of Ann Herrmann-Nehdi, the Chairman of the Board and Chief Thought Leader of HI. [Id. at ¶ 1]. Mr. Herrmann developed numerous analytical models, practical tools, and

4

software algorithms for psychometric assessment techniques and applications to define and describe the way humans process information, communicate, and solve problems. [Id. at ¶ 6]. In or about 1979, Mr. Herrmann created the first version of the Herrmann Brain Dominance Instrument ("HBDI"). At the core of the HBDI is an algorithm developed by Mr. Herrmann based on his research on the connections between brain perception, processing structures, and patterns. [Id. at ¶ 7]. Plaintiffs' business revolves around the administration of the HBDI assessment to individuals and consulting and training regarding the effective use of the HBDI results. Plaintiffs also provide these services to companies and other organizations to aid the companies in interpreting the HBDI assessment results of their employees and executives. [Id. at ¶ 8]. Plaintiffs' business depends, in part, on an extensive database of the HBDI profiles of many individuals having taken the HBDI assessment, either directly through Plaintiffs or through Plaintiffs' licensees and partners, which for many years included the Defendants. [Id.].

Over the years, Plaintiffs have developed and used highly confidential, proprietary information ("Trade Secrets"). [Id. at ¶ 9]. Such Trade Secrets specifically include the algorithms underlying the implementation, scoring, and interpretation of the HBDI assessment and its results; an extensive

collection of client data consisting of and derived from HBDI assessment results; and software source code, including code for implementing, scoring, and interpreting the HBDI assessment and its results. These Trade Secrets also include client lists and consulting and training techniques, tools, and materials, including those for the training, certification, and accreditation to administer the HBDI and to interpret the results. [Id.].

After some time, Plaintiffs decided to expand their business to serve key European markets. To this end, Plaintiffs and Defendants, including Defendants' predecessors in interest, entered into an oral license agreement ("License Agreement") covering the intellectual property and proprietary information now owned by HG. [Id. at ¶ 10]. The License Agreement was formed after a series of meetings between Plaintiffs and Defendants in Lake Lure, North Carolina, and other locations in the United States. Vuillemin traveled to HI's Lake Lure, North Carolina, facility to attend and participate in a training and HBDI certification workshop, which was held November 7-10, 1985. This workshop was conducted by and on behalf of HBDI. [Id. at ¶ 13]. Next, Vuillemin traveled to Faber, Virginia, to attend and participate in Plaintiffs' Applied Creative Thinking ("ACT") workshop, which was held from October 26-30, 1987. During the ACT workshop, Vuillemin received additional training on Plaintiffs' assessment and consulting methods.

6

Vuillemin also met with HI's representatives to discuss a potential expanded business relationship with Plaintiffs. [Id. at ¶ 14]. Finally, after the conclusion of the ACT workshop, from October 31 to November 2, 1987, Vuillemin visited with the principals of HI, including Mr. Herrmann, Ann Herrmann-Nehdi, and others, in Lake Lure, North Carolina. [Id. at ¶ 15]. On November 1, 1987, at a dinner attended by Vuillemin, Mr. Herrmann, Ann Herrmann-Nehdi, Vuillemin's then-colleague Betrand de Leusse, and others, it was decided that HI would work with Vuillemin and de Leusse to create what became known as Defendant HIE. It was furthered agreed that HIE would be a licensee of HI and its intellectual property and HIE would distribute the HBDI assessment and provide related training and consulting services and materials on behalf of HI. [Id.].

After the conclusion of these meetings, Vuillemin traveled to Monterrey, California, to participate in HI's Creative Problem Solving ("CPS") workshop, held from November 4-6, 1987. At the CPS workshop, Vuillemin received further training regarding the Plaintiffs' assessment and related consulting methods in furtherance of HIE's role as a licensee of HI's intellectual property. [Id. at ¶ 16]. In or around July 1990, Vuillemin attended a master class in the Plaintiffs' assessment, training, and consulting methods in connection with and in furtherance of Defendants' licensing and business

7

relationship with Plaintiffs.  After the master class, Vuillemin also participated in a meeting of all international licensees of HI in furtherance of the licensing relationship.  The master class and the meeting were held in Lake Lure.  On or about August 1, 1991, Vuillemin traveled to Lake Lure for business meetings with Plaintiffs.  [Id. at ¶ 17].

Vuillemin's travels to Lake Lure resumed when, between December 27, 2003 to January 4, 2004, Vuillemin participated in business meetings with Plaintiffs relating to the License Agreement and Defendants' business as licensees of Plaintiffs.  [Id. at ¶ 18].  Vuillemin was again in Lake Lure from June 15-21, 2004.  This time Vuillemin participated in and presented at Plaintiffs' THINC conference.  Before and after this conference, Vuillemin attended meetings with Plaintiffs relating to Defendants' business under the License Agreement.  [Id. at ¶ 19].  Finally, from January 14-22, 2009, Vuillemin attended a global business meeting for Plaintiffs' licensees and business partners held by Plaintiffs in Lake Lure.  [Id. at ¶ 20].

Over the course of these visits, Vuillemin discussed the terms of the License Agreement and Defendants' business relationship with Plaintiffs, engaged in and expanded that business relationship, and obtained training in and access to Plaintiffs' Trade Secrets.  [Id. at ¶ 12].  The parties enjoyed a successful licensing relationship for many years.  [Id. at ¶ 21].  Until

8

recently, Defendants substantially complied with Plaintiffs' business and intellectual property policies, exchanged client data and HBDI assessment results with Plaintiffs and Plaintiffs' other licensees in a global database, attended licensee meetings and training sessions in North Carolina and elsewhere, and made royalty payments to HI in North Carolina consistent with the License Agreement. [Id. at ¶ 21].

Between 1981 and 2002, Plaintiffs registered many original and creative works of authorship related to the Herrmann brand, including a number of articles and assessment tools, that were developed in the course of research and business operations ("Herrmann Copyrights"). [Id. at ¶ 43]. Between 2007 and 2016, Plaintiffs also registered and used several distinctive trademarks, including HERRMANN®, HBDI®, HERRMANN BRAIN DOMINANCE INSTRUMENT®, WHOLE BRAIN®, and three different iterations of a color graphic logo ("Herrmann Trademarks"). [Id. at ¶ 36]. Plaintiffs directly and through licensees have adopted and used the Herrmann Trademarks on a substantially exclusive and continual basis in connection with Plaintiffs' business since their adoption. [Id.].

In 2011, the parties began negotiations for Plaintiffs to acquire Defendants' companies at the request of Vuillemin, who wanted to retire. [Id. at ¶ 22]. In 2015, the negotiations faltered when the parties were unable to

9

agree on a contract price for the companies. Thereafter, Defendants stopped making timely royalty payments, disavowed their obligations under the License Agreement, and ultimately breached the License Agreement. This breach included the failure to comply with Plaintiffs' intellectual property policies, the failure to pay intellectual property royalties, and the seizure of control of one of Plaintiffs' computer servers through which Plaintiffs' HBDI application operates. [Id. at ¶¶ 22-26]. As a result of this server take over, Defendants have unauthorized access to Plaintiffs' trade secrets database of HBDI user profiles. [Id. at ¶ 26]. Since Defendants' repudiation of the License Agreement, Plaintiffs and Defendants now directly compete for the same business. [Id. at ¶ 30].

After the Defendants' alleged breach and repudiation of the License Agreement, Defendants have continued to use in commerce trademarks incorporating the Herrmann Trademarks. Defendants have also registered several domain names incorporating the Herrmann Trademarks. Plaintiffs contend these infringing trademarks and domain names are identical and/or confusingly similar to the Herrmann Trademarks and are used both inside and outside the United States. [Id. at ¶ 41]. Further, after the repudiation, Defendants continued to use materials that incorporate identical copies of

the Herrmann Copyrights, including in North Carolina and other parts of the United States.  Id. at ¶ 44.

On March 7, 2017, Plaintiffs filed the present suit against Defendants, raising various claims regarding the use of Plaintiffs' registered trademarks and breach of the License Agreement; including claims under the Lanham Act, 15 U.S.C. § 1051 et seq.; a claim for copyright infringement under 17 U.S.C. § 101; claims for trade secret misappropriation under federal and state law, 18 U.S.C. § 1832 et seq. and N.C.G.S. § 66-152 et seq., respectively; and state law claims for breach of contract, tortious interference with contract, common law trademark infringement, and "alter ego and joint liability."  [Doc. 1].  On February 12, 2018, Defendants filed a motion to dismiss for lack of personal jurisdiction with a supporting brief, including the Affidavits of Serge Gisbert and Lionel Marc Vuillemin with exhibits thereto. [Docs. 16, 17].  The Plaintiffs filed a responding brief with the Affidavit of Ann Herrmann-Nehdi with exhibits thereto.  [Doc. 18].  Defendants filed a reply brief with a second, additional Affidavit of Vuillemin.  [Doc. 20].  On April 20, 2018, Defendants filed a Notice of Supplemental Authority, submitting to the Court a Ruling from the Commercial Court of Versailles and an English translation of this Ruling.  [Doc. 21].  Plaintiffs filed a response to this supplemental authority.  [Doc. 22].

The Defendants' motion is now ripe for disposition.

## III. DISCUSSION

For the Court to have personal jurisdiction, the Plaintiffs must make a prima facie showing that exercising jurisdiction will (1) comply with the forum state's long-arm statute and (2) comport with the due process requirements of the Fourteenth Amendment. See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted). Because North Carolina's long-arm statute has been construed to extend as far as due process allows, Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001), this two-pronged test is collapsed into the single inquiry of whether the exercise of personal jurisdiction over the defendant comports with due process. Universal Leather, 773 F.3d at 559.

A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has sufficient "minimum contacts" with the forum, such that to require the defendant to defend its interest in that state "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The sufficiency of the contacts depends on the circumstances of the case. A court can have personal jurisdiction

over a defendant for all claims if the defendant's contacts with the forum state are continuous and systematic. This is referred to as "general jurisdiction."[2] However, more limited contacts can be sufficient to establish personal jurisdiction over a defendant where those contacts relate to the substance of the particular claim being asserted. This is referred to as "specific jurisdiction." See e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984). In determining whether specific jurisdiction exists, the Court considers (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711-12 (4th Cir. 2002), cert. denied, 537 U.S. 1105 (2003).

The first prong of the specific jurisdiction inquiry is grounded on the premise that "a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there." Universal Leather, 773 F.3d at 559 (quoting Tire Eng'g and Distribution, LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 301 (4th Cir. 2012)). In determining whether a foreign defendant has

---

[2] The Plaintiffs do not contend that this Court has general jurisdiction over the Defendants.

purposefully availed itself of the privilege of conducting business in a forum state, the Court asks whether "the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th Cir. 1989) (quoting World-Wide Volkswagen v. Woodsen, 444 U.S. 286, 297 (1980)). This analysis is flexible and "depends on a number of factors that courts consider on a case-by-case basis." Universal Leather, 773 F.3d at 560 (citing Tire Eng'g, 682 F.3d at 302). In the business context, those factors include, but are not limited to: (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; (7) the nature, quality and extent of the parties' communications about the business being transacted; and (8) whether the performance of contractual duties was to occur within the forum. Id. (quotation marks and citation omitted). The Fourth Circuit "generally [has] concluded that a foreign defendant has

14

purposefully availed itself of the privilege of conducting business in the forum state when the defendant 'substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.'" Id. (citing Tire Eng'g, 682 F.3d at 302).

The first prong is easily satisfied under the alleged facts of this case. Defendants, by and through Vuillemin, travelled to North Carolina several times to initiate and in furtherance of the formation of a business relationship with Plaintiffs, both companies based in North Carolina. The parties entered into the alleged oral License Agreement in North Carolina when Vuillemin was physically present in the State. Defendants directed payments under the alleged License Agreement to Plaintiffs in North Carolina. Defendants visited North Carolina several times after the License Agreement was reached in furtherance of and performance under that agreement. These visits included discussion of the terms of the License Agreement and Defendants' business relationship with the Plaintiffs, expansion of that business relationship, and Defendants obtaining training in and access to Plaintiffs' Trade Secrets. In short, Vuillemin engaged in a course of conduct over a period of 25 years through which he purposefully availed the Defendants of the privilege of conducting business in the forum state.

Defendants "should reasonably anticipate being haled into court" in North Carolina.  See World-Wide Volkswagen, 444 U.S. at 297.

With respect to the second prong of specific jurisdiction, once purposeful availment is satisfied, a court looks to whether "the plaintiff's claims arise out of activities directed at the forum state."  Tire Eng'g, 682 F.3d at 303.  Where the activity in the forum state is the genesis of the dispute, this prong is easily satisfied.  Id. (internal quotation marks and citation omitted).  Similarly, this prong is satisfied if "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." Id.  Here, the Plaintiffs' claims arise from the Defendants' purposefully directed activities in the forum state, as described supra.  Namely, the substantial collaboration between the parties, with the Plaintiffs being North Carolina corporations, forms an integral part of the Plaintiffs' claims.  Accordingly, the second prong is satisfied.

The Court turns to the final prong of the analysis: whether the exercise of personal jurisdiction would be constitutionally "reasonable."  This prong "ensures that litigation is not 'so gravely difficult and inconvenient' as to place the defendant at a severe disadvantage in comparison to his opponent." CFA Institute v. Institute of Chartered Financial Analysis of India, 551 F.3d

285, 296 (4th Cir. 2009) (quoting Nolan, 259 F.3d at 217). "The burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief guide [the Court's] inquiry." Tire Eng'g, 682 F.3d at 303 (citation omitted).

The corporate Defendants are French companies organized and existing pursuant to the laws of France. Defendant Vuillemin is a resident of France, the president of Defendant HIE and HT, and "controls" Defendant Brain Ressources. However, a corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome. Id. The Fourth Circuit recognizes that a foreign defendant's "ability to secure counsel in the forum state and its choice to do business with a forum resident – which also made the prospect of litigation in the state foreseeable – counseled that defending the suit would not be particularly burdensome." Id. Here, all the Defendants have secured counsel to represent them in this matter and, at least according to the Plaintiffs' allegations, chose to do business with forum residents. Further, in this case, North Carolina maintains a "substantial interest" in resolving the grievances of its businesses, Plaintiffs HI and HG, particularly when North Carolina law governs or informs some of the claims. [Doc. 1 at ¶¶ 1, 2, 37-42, 81-88, 90-105]. Finally, the Plaintiffs have a substantial interest in protecting their

17

trademark and business interests "after having 'carved out a market niche by cultivating' their distinctive mark and products." Tire Eng'g, 682 F.3d at 303 (quoting Nolan, 259 F.3d at 297). As such, the third prong of the test for specific personal jurisdiction is met.[3]

As the Plaintiffs have shown a prima facie case of personal jurisdiction over the Defendants, the Defendants' motion to dismiss is denied.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion to Dismiss [Doc. 16] is **DENIED**.

**IT IS SO ORDERED**.

Signed: September 28, 2018

Martin Reidinger
United States District Judge

---

[3] Plaintiffs also argue that the Court could exercise jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(2), which allows a court to exercise personal jurisdiction over a foreign defendant where the defendant is not subject to jurisdiction in any particular state but has sufficient contacts with the United States as a whole to satisfy due process requirements. Fed. R. Civ. P. 4(k)(2); ISI Intern., Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 551 (7th Cir. 2001). The Court need not address this argument given its finding of specific personal jurisdiction in the forum state.