**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:17-cv-00073-MR**

| | | |
|---|---|---|
| **HERRMANN INTERNATIONAL, INC. and** | ) | |
| **HERRMANN GLOBAL, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **O R D E R** |
| | ) | |
| **HERRMANN INTERNATIONAL EUROPE,** | ) | |
| **HERRMANN TECHNOLOGIE, BRAIN** | ) | |
| **RESSOURCES, and LIONEL MARC** | ) | |
| **VUILLEMIN,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiffs' Motion for Default

Judgment. [Doc. 68].

# I.    PROCEDURAL BACKGROUND

On March 7, 2017, the Plaintiffs Herrmann International, Inc. ("HI") and

Hermmann Global, LLC ("HG" and collectively the "Plaintiffs") filed this action

against the Defendants Herrmann International Europe ("HIE"), Herrmann

Technologie ("HT"), Brain Ressources ("BR"), and Lionel Marc Vuillemin

("Vuillemin" and collectively the "Defendants"). [Doc. 1].   The Plaintiffs

asserted claims related to the breach of a licensing agreement between the

parties (the "License Agreement") and the misuse of the Plaintiffs' intellectual

property, including claims under the Lanham Act, 15 U.S.C. § 1051 et seq.; the Copyright Act, 17 U.S.C. § 101; claims for trade secret misappropriation under federal and state law, 18 U.S.C. § 1832 et seq. and N.C. Gen. Stat. § 66-152 et seq., respectively; and state law claims for breach of contract, tortious interference with contract, common law trademark infringement, and "alter ego and joint liability." [Id.].

On December 13, 2017, the Defendants acknowledged service of the summons and the Complaint. [Doc. 11]. On February 12, 2018, Defendants filed a motion to dismiss for lack of personal jurisdiction. [Doc. 16]. On September 28, 2018, the Court denied the Defendants' motion to dismiss. [Doc. 23].

On September 6, 2019, the Plaintiffs filed an Amended Complaint against the Defendants. [Doc. 43].

On December 23, 2019, the Plaintiffs filed a Motion for Partial Summary Judgment. [Doc. 51]. The Defendants opposed the Plaintiffs' Motion. [Doc. 56]. On January 30, 2020, the Court entered a text-only order denying the Plaintiffs' Motion for Partial Summary Judgment. [Text-Only Order entered Jan. 30, 2020].

On August 5, 2020, the Defendants' counsel advised the Court that the Defendants were not going to appear for trial. [Doc. 62 at ¶ 6]. On August

7, 2020, the Defendants' counsel moved to withdraw. [Docs. 63, 64]. On August 11, 2020, the Court entered an order granting the motion to withdraw, directing the Defendants to retain new counsel within 14 days, and directing Defendant Vuillemin to advise the Court if he intended to proceed *pro se*. [Doc. 65]. After the Defendants failed to respond to the Court's order, the Court directed the Clerk to enter default against the Defendants on August 26, 2020. [Doc. 66]. On August 26, 2020, the Clerk entered a default. [Doc. 67].

On September 4, 2020, the Plaintiffs filed the present Motion for Default Judgment, asking the Court to (1) find the Defendants liable on the claims for breach of contract, trademark and copyright infringement, misappropriation of trade secrets, and tortious interference; (2) find Defendant Vuillemin jointly and severally liable with the other Defendants; (3) award the Plaintiffs a monetary judgment, consisting of unpaid royalties and lost profits, jointly and severally against all the Defendants; (4) enter a permanent injunction enjoining the Defendants from continuing to infringe the Plaintiffs' trademarks and copyrights, using or disclosing the Plaintiffs' trade secretes or falsely claiming an affiliation with the Plaintiffs, Ned Herrmann, or his work, and requiring the Defendants to transfer to the Plaintiffs all trademark registrations, domain names, and domain

3

registrations that are confusingly similar to the Herrmann Trademarks; (5) declare that the license agreement between the parties is terminated and that the Defendants have no ownership or interest in the Plaintiffs' trademarks, the Plaintiffs' copyrights, or the Plaintiffs' trade secrets; and (6) award the Plaintiffs attorneys' fees and costs in the amount of $660,192.63. [Doc. 68-1 at 4-5].

## II. STANDARD OF REVIEW

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of a default when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Once a defendant has been defaulted, the plaintiff may then seek a default judgment. If the claim is for a sum certain or can be made certain by computation, the Clerk of Court may enter the default judgment. Fed. R. Civ. P. 55(b)(1). In all other cases, the plaintiff must apply to the Court for a default judgment. Fed. R. Civ. P. 55(b)(2).

"The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact . . . ." Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001) (quoting Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)). A defendant, however, "is not held . . . to admit conclusions of law." Ryan, 253 F.3d at 780 (quoting

<u>Nishimatsu</u>, 515 F.2d at 1206).  The Court, therefore, must determine whether the facts as alleged state a claim.  <u>GlobalSantaFe Corp. v. Globalsantafe.com</u>, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003).

"If the court finds that liability is established, it must then turn to the determination of damages."  <u>See</u> <u>Ryan</u>, 253 F.3d at 780–81.  The court must make an independent determination regarding damages and cannot accept as true factual allegations of damages. <u>S.E.C. v. Lawbaugh</u>, 359 F.Supp.2d 418, 422 (D. Md. 2005).

## III.  FACTUAL BACKGROUND

The well-pleaded factual allegations of the Plaintiffs, deemed admitted as a result of the Defendants' default, establish the following.

Beginning in the early 1960s, Ned Herrmann pioneered the field of brain research as it relates to business management and performance. [Doc. 43 at ¶ 15].  Mr. Herrmann created the first version of the Herrmann Brain Dominance Instrument ("HBDI") assessment, which is a psychometric test that defines and describes the way individuals think.  [<u>Id.</u> at ¶ 16].  The Herrmann Thinking Management System ("HTMS") is a web application that allows authorized users to administer the HBDI assessment.  [<u>Id.</u> at ¶ 17].

The Plaintiffs are professional services companies that provide assessments of cognitive, behavioral, and personality traits for education,

business management training, and leadership development. [Id at ¶¶ 1-2]. That includes the HBDI assessment. [Id.]. The Plaintiffs have expended considerable effort, expense, and resources to promote Mr. Herrmann's research through the use of several distinctive trademarks, including "HERRMANN," "HBDI," "HERRMANN BRAIN DOMINANCE INSTRUMENT," "WHOLE BRAIN," and various iterations of the four-color graphic logos shown below (collectively "the Herrmann Trademarks").



[Doc. 43 at ¶ 18]. The United States Patent and Trademark Office has recognized the enforceability of the Herrmann Trademarks as detailed below:

| Registration No. | Trademark | Registration Date |
|---|---|---|
| 3,317,364 | HERRMANN | 10/23/2007 |
| 3,243,946 | HERRMANN BRAIN DOMINANCE INSTRUMENT | 5/22/2007 |
| 3,317,363 | HBDI | 10/23/2007 |
| 3,894,545 | HBDIINTERACTIVE | 12/21/2010 |
| 3,339,401 | WHOLE BRAIN | 11/20/2007 |
| 3,343,876 | WHOLE BRAIN TECHNOLOGY | 11/27/2007 |
| 3,422,874 | WHOLE BRAIN CREATIVITY | 5/6/2008 |

| | | |
|---|---|---|
| 3,243,939 | THE BUSINESS OF THINKING | 5/22/2007 |
| 4,856,188 | THINKING AGILITY | 11/17/2015 |
| 4,889,922 | THINKCENTERED | 1/19/2016 |
| 3,887,178 | THINKING ACCELERATOR | 12/7/2010 |
| 3,610,290 | ROI | 4/21/2009 |
| 3,776,400 | BRAINBYTES | 4/13/2010 |
| 3,311,874 | [Four-color logo] | 10/16/2007 |
| 3,894,542 | [Four-color logo] | 12/21/2010 |
| 4,246.661 | [Four-color logo] | 11/20/2012 |

[Doc. 43 at ¶ 19]. The Plaintiffs exercise strict control over the quality and nature of services bearing the distinctive Herrmann Trademarks. [Id.].

The Plaintiffs have registered several copyrights, including the following (the "HG Copyrights"):

| Registration No. | Title | Registration Date |
|---|---|---|
| TX0005649894 | Business of thinking: think about decision making: facilitator guide. | 2002 |
| TX0005634457 | Business of thinking: think about problem solving: participant workbook. | 2002 |
| TX0005634456 | Business of thinking: think about communicating : participant workbook. | 2002 |
| TX0005390546 | ABCDs of whole-brain instructional technology | 2001 |
| TX0005388740 | Design IT whole-brain way. | 2001 |
| TX0005384438 | Instructions for using design IT cards | 2001 |
| TX0002868547 | Participant survey form of the Herrmann brain dominance instrument, HBDI. | 1990 |
| TX0002868546 | Herrmann participant survey form. | 1981 |

7

| TX0002868545 | Herrmann 20 questions. | 1983 |
|---|---|---|
| TX0005873051 | Business of thinking: think about problem solving, version 2A. | 2002 |
| TX0005649900 | Business of thinking: think about creative thinking: facilitator guide. | 2002 |
| TX0005649899 | Business of thinking: start thinking: facilitator guide. | 2002 |
| TX0005649898 | Business of thinking: think about creative thinking: participant workbook. | 2002 |
| TX0005649897 | Business of thinking: think about decision making: participant workbook. | 2002 |
| TX0005649896 | Business of thinking: start thinking: participant workbook. | 2002 |
| TX0005649895 | Business of thinking: think about communicating: facilitator guide. | 2002 |

[Id. at ¶ 24].

The Plaintiffs have developed and used highly confidential, proprietary information (the Plaintiffs' "Trade Secrets"). [Id. at ¶ 25]. Such Trade Secrets include the algorithms underlying the HBDI assessment and the scoring and interpretation of HBDI assessment results; client data consisting of and derived from HBDI assessment results; and software source code, including code for implementing the HBDI assessment and scoring and interpreting HBDI assessment results. [Id.]. The Trade Secrets also include client lists and consulting and training techniques, tools, and materials, including those

8

for the training, certification, and accreditation to administer the HBDI and to interpret the results.  [Id.].

At some point, the Plaintiffs decided to expand their business into European markets.  [Id. at ¶ 26].  To this end, the Plaintiffs entered into the License Agreement with Defendants HIE, HT, and BR.  [Id.].  Defendants HIE, HT, and BR are French companies organized and registered under the laws of France.  [Id. at ¶¶ 3-5].  Defendant Vuillemin, who is a resident of France, serves as the president of HIE and HT and "controls" BR.  [Id.].

The License Agreement gave Defendants HIE, HT, and BR "(A) exclusive territorial rights[1] to use the Herrmann Trademarks, the [HG] Copyrights, and Plaintiffs' Trade Secrets and (B) access to the Plaintiffs' databases, resources, and proprietary information and support in exchange for (A) Defendants' payment of the licensing royalties; (B) compliance with Plaintiffs' business, brand and intellectual property policies, including exchange and sharing of client data to create a global network and protection of confidential information; and (C) participation in the Plaintiffs' proprietary training, sales, and marketing programs[.]"  [Id. at ¶ 27].  The License

---

[1] The territorial scope of the license was the geographic territory of France.  [Doc. 43 at ¶ 26].

Agreement was confirmed by written royalty schedules, correspondence, and the parties' extensive courses of performance and dealing.  [Id. at ¶ 26].

The parties conducted business under the License Agreement for decades.  [Id. at ¶ 28].  During that time, the Defendants substantially complied with Plaintiffs' business and intellectual property policies, exchanged client data and HBDI assessment results with the Plaintiffs and the Plaintiffs' other licensees in a global database, attended meetings and training sessions, and made royalty payments consistent with the License Agreement.  [Id.].  Defendant Vuillemin, as the authorized agent of HIE and HT, repeatedly acknowledged the Defendants' obligations under the License Agreement and rendered and ratified performance accordingly.  [Id.].

In 2011, Defendant Vuillemin notified the Plaintiffs that he wanted to retire.  [Id. at ¶ 29].  The Plaintiffs and the Defendants began negotiations for the Plaintiffs to purchase HIE, HT, and BR.  [Id.].  The negotiations faltered in 2015 because the parties could not agree on a valuation.  [Id.].  Thereafter, the Defendants breached the License Agreement by failing to make royalty payments, failing to comply with the Plaintiffs' intellectual property policies, and creating false records.  [Id.].

On October 12, 2015, the Defendants seized a computer server that the parties had used to operate the HTMS software application, which allows

users to complete HBDI assessments electronically. [Id. at ¶ 32]. The Defendants took control of the server and terminated the Plaintiffs' ability to control it. [Id.]. The Defendants then re-directed the domain name to direct internet traffic to a new server, based in France, onto which Defendants copied the contents of the original server. [Id.]. Since that time, users have been directed to the server that is controlled by the Defendants, depriving the Plaintiffs of access to data and client contacts. [Id.].

After the Defendants breached the License Agreement, the Defendants have continued to use trademarks in commerce that incorporate the Herrmann Trademarks. [Id. at ¶ 30]. That includes the following trademark in connection with a web application called "HBDI Junior":



[Id. at ¶ 46]. The Defendants have also registered several domain names that incorporate the Herrmann Trademarks, including herrmann-

11

europe.com, hbdi.biz, and derivatives thereof (the "Infringing Domain Names"). [Id. at ¶ 30]. The Plaintiffs contend these infringing trademarks and domain names are identical and/or confusingly similar to the Herrmann Trademarks. [Id.].

## IV.   DISCUSSION

### A.   Breach of Contract

The Plaintiffs' first cause of action is for breach of contract. [Doc. 68-1 at 10; Doc. 43 at ¶¶ 37-44]. To assert a claim for breach of contract under North Carolina law, a plaintiff must allege (1) the existence of a valid contract and (2) a breach of the terms of that contract. See Samost v. Duke Univ., 226 N.C. App. 514, 518, 742 S.E.2d 257, 260 (2013); Highland Paving Co., LLC v. First Bank, 227 N.C. App. 36, 40, 742 S.E.2d 287, 291 (2013).

### 1.   Defendants HIE, HT, and BR

The Plaintiffs present sufficient factual allegations, taken as true by virtue of the Defendants' default, to establish a breach of contract claim against Defendants HIE, HT, and BR. First, the Plaintiffs allege that Defendants HIE, HT, and BR agreed to the License Agreement and performed in accord with the License Agreement for several years. [Doc. 43 at ¶¶ 27-29, 38]. The Plaintiffs allege that the License Agreement granted Defendants HIE, HT, and BR exclusive territorial rights to use the Herrmann

12

Trademarks, the HG Copyrights, the Plaintiffs' Trade Secrets, the Plaintiffs' databases, the Plaintiffs' resources, and the Plaintiffs' proprietary information in exchange for Defendants HIE, HT, and BR paying royalties, complying with the Plaintiffs' business, brand and intellectual property policies, and participating in the Plaintiffs' proprietary training, sales, and marketing programs. [Id. at ¶ 27]. Taking those allegations as true, a valid contract existed between the parties.

Second, the Plaintiffs allege that the Defendants breached the License Agreement by not making royalty payments, failing to comply with the Plaintiffs' intellectual property policies, and seizing control of one of Plaintiffs' computer servers. [Id. at ¶¶ 29, 32]. Taking those allegations as true, Defendants HIE, HT, and BR breached the terms of the License Agreement. Accordingly, the Plaintiffs' allegations, taken as true by virtue of the Defendants' default, establish a claim for breach of contract against Defendants HIE, HT, and BR.

## 2. Defendant Vuillemin

Defendant Vuillemin entered into the License Agreement as a corporate officer of Defendants HIE, HT, and BR, not individually. A claim for "[b]reach of contract cannot be asserted against a person who was not a party to the contract sought to be enforced." Justice v. Dimon, No. 3:10-cv-

13

00413, 2011 WL 2183146, at *5 (W.D.N.C. June 6, 2011) (citing Canady v. Mann, 107 N.C.App. 252, 259 (1992)). Moreover, "corporate officers and directors are generally not liable for the debts of their corporation" and are "not personally liable for the contract's breach . . . ." DeWitt v. Hutchins, 309 F. Supp. 2d 743, 752 (M.D.N.C. 2004) (citation omitted). Under North Carolina law, however, courts "will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." Glenn v. Wagner, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). Accordingly, Defendant Vuillemin may be held liable for breach of contract if the Plaintiffs pierce the corporate veil of Defendants HIE, HT, and BR. See DeWitt, 309 F. Supp. 2d at 752.

"Generally, the law of the state of incorporation governs a claim for piercing the corporate veil." Ace Motor Acceptance Corp. v. McCoy Motors, LLC, No. 3:18-cv-00630-KDB, 2020 WL 223923, at *6 (W.D.N.C. Jan. 14, 2020) (Bell, J.); see also USA Trouser v. Int'l Legwear Group, Inc., No. 1:11-cv-00244-MR-DLH, 2012 WL 6553108 n.3 (W.D.N.C. Dec. 14, 2012) (Reidinger, J.) (applying the law of the place of incorporation of the defendant corporation for a piercing the corporate veil claim); Jo v. Piston Mfg., Inc., No. 4:06-cv-00056-F, 2009 WL 1578522, at *8 (E.D.N.C. June 2, 2009)

(same); <u>Dassault Falcon Jet Corp. v. Oberflex, Inc.</u>, 909 F. Supp. 345, 349 (M.D.N.C. 1995) (stating that "if the North Carolina Supreme Court were faced with a choice of law question for piercing the corporate veil, it would adopt the internal affairs doctrine and apply the law of the state of incorporation."). Because HIE, HT, and BR are incorporated in France, the Plaintiffs' attempts to pierce the corporate veil are a question of French law.

Under Federal Rule of Civil Procedure 44.1, "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." "Rule 44.1 provides courts with broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do so." <u>Baker v. Booz Allen Hamilton, Inc.</u>, 358 F. App'x 476, 481 (4th Cir. 2009) (citing <u>Carey v. Bahama Cruise Lines</u>, 864 F.2d 201, 205 (1st Cir. 1988). "Thus, the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case." <u>Id.</u> (citation omitted). "Where a party fails to satisfy either burden, the district court should apply the forum state's law." <u>Id.</u> (citing <u>Ferrostaal, Inc. v. M/V Sea Phoenix</u>, 447 F.3d 212, 216 (3d Cir. 2006)); <u>see also</u> <u>Indura S.A. v. Engineered Controls Int'l Inc.</u>, No. 1:10-cv-00457, 2011

WL 3862083, at *27 (M.D.N.C. Sept. 1, 2011) (applying North Carolina law where the plaintiff failed to provide the relevant foreign law to the court).

The Plaintiffs never provided notice under Rule 44.1 that foreign law applies to this dispute. Moreover, the Plaintiffs' Motion for Default Judgment provides no analysis regarding whether French law allows a plaintiff to pierce the veil of a French corporation. Because the Plaintiffs have failed to provide the Court with the relevant French law, the Court will apply the law of the forum state. Baker, 358 F. App'x at 481 (citation omitted); see also Indura S.A., 2011 WL 3862083, at *27.[2] Accordingly, North Carolina law governs the Plaintiffs' attempts to pierce the corporate veil.[3]

---

[2] The Plaintiffs' Motion for Default Judgment fails to address many of the difficult legal issues presented in this case. [See Doc. 68-1 (failing to mention the applicability of French law to the Plaintiffs' attempt to pierce the corporate veil; whether the Lanham Act, the Copyright Act, or the DTSA can be applied extraterritorially; or whether the DTSA claim can be applied to a misappropriation that started prior to the DTSA's enactment date); see also Doc. 71 (ordering the Plaintiffs to submit supplemental briefing on whether the Lanham Act, the Copyright Act, and the DTSA can be applied extraterritorially)]. "It is not the Court's job to do counsel's legal research for them." Gorham v. Amusements of Rochester, Inc., No. 1:14-cv-00386, 2015 WL 2454261, at *6 (M.D.N.C. May 22, 2015). Although Rule 44.1 provides that the Court "may engage in its own research and consider any relevant material" when arguments are "presented by counsel . . . in insufficient detail," Fed. R. Civ. P. 41.1 Advisory Committee Notes, (1966 Adoption), the Court declines to expend further judicial resources to conduct such research here.

[3] Although the Plaintiffs do not cite any French law, the Court's limited research shows that French law allows piercing of the corporate veil in certain situations. Stephen B. Presser, Piercing the Corporate Veil, § 5:4 (stating that "[t]he main grounds to 'pierce the corporate veil' under French law are the Bankruptcy Statute and two court doctrines: the fictitious company doctrine ('société fictive') and the commingling of assets doctrine ('confusion des patrimoines')."). These doctrines appear to comport in most respects with North Carolina law regarding piercing the corporate veil.

16

"In North Carolina, what has been commonly referred to as the 'instrumentality rule' forms the basis for disregarding the corporate entity or 'piercing the corporate veil.'" <u>Glenn v. Wagner</u>, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). A party attempting to pierce the corporate veil under the instrumentality rule must show that (1) the defendant had complete domination and control over the company such that the company had no separate mind, will, or existence of its own, (2) such control was used by the defendant to commit a fraud or wrong or to perpetrate a violation of a statutory or other legal duty, and (3) such control and breach of duty proximately caused the plaintiff's injury. <u>Id.</u> at 455, 329 S.E.2d at 330. The burden is on the plaintiff to establish factors that justify disregarding the corporate entity. <u>Id.</u>

In considering the first element — whether the defendant had complete domination and control over the company such that the company had no separate mind, will, or existence of its own — courts commonly weigh four factors: "(1) inadequate capitalization; (2) noncompliance with corporate formalities; (3) complete domination and control of the corporation so that it has no independent identity; and (4) excessive fragmentation of a single enterprise into separate corporations." <u>Mansfield v. Pierce</u>, No. 96-1904, 1998 WL 433304, at *4 (4th Cir. July 27, 1998) (table) (citation omitted). The

Amended Complaint alleges that Defendants HIE, HT, and BR are "mere shells and naked frameworks which Defendant Vuillemin has used as a conduit for the conduct of his personal business, interest, and property." [Doc. 43 at ¶ 106]. The Amended Complaint further alleges that "Defendant Vuillemin has influenced, controlled, and dominated the acts, business, and property of" Defendants HIE, HT, and BR, thereby "creating a unity of interest and ownership among these entities and with himself, such that the individuality and separateness of" them have ceased. [Id. at ¶ 105]. The Plaintiffs offer no specific allegations regarding the capitalization or HIE, HT, or BR, or whether they have failed to comply with corporate formalities. Nevertheless, the Plaintiffs' allegations, taken as true by virtue of the Defendants' default, establish that HIE, HT, and BR were so dominated by Defendant Vuillemin that they had no "separate mind, will or existence" other than as a "mere instrumentality or tool" of Defendant Vuillemin. Glenn, 313 N.C. at 455, 329 S.E.2d at 330.

The second element necessary to pierce the corporate veil is that a defendant must have used control of the corporation "to commit fraud or wrong" such as "the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." Id. A breach of contract can serve as such a wrong only "where an individual

defendant created a corporation for the sole purpose of entering the contract at issue and at the same time unjustly insulating the defendant from liability under the contract." Best Cartage, Inc. v. Stonewall Packaging, LLC, 219 N.C. App. 429, 440, 727 S.E.2d 291, 300-01 (2012).

The Amended Complaint alleges that Defendant Vuillemin caused Defendants HIE, HT, and BR to disavow their obligations under the License Agreement and breach the License Agreement. [Id. at ¶ 29]. Those allegations, taken as true by virtue of the Defendants' default, establish that Defendant Vuillemin used his control of Defendants HIE, HT, and BR "to commit a fraud or wrong or to perpetrate a violation of a statutory or other legal duty" by breaching the License Agreement. Glenn, 313 N.C. at 455, 329 S.E.2d at 330.

Defendants HIE and HT are both named after the Herrmann products, which suggests that those companies were formed to enter the License Agreement with HI and HG. Moreover, BR is named after the primary subject-matter of the License Agreement. Taking the Plaintiffs' allegations as true and taking all reasonable inferences in the Plaintiffs' favor, those allegations establish that Defendant Vuillemin formed HIE, HT, and BR for the sole purpose of entering into the License Agreement. The Amended Complaint further alleges that Defendants HIE, HT, and BR "were

19

maintained and used as devices to avoid individual liability and financial responsibility of Defendant Vuillemin." [Doc. 43 at ¶ 108]. Accordingly, the Plaintiffs' allegations, taken as true by virtue of the Defendants' default, are sufficient to establish that HIE, HT, and BR were created "for the sole purpose of entering the contract at issue and at the same time unjustly insulating the defendant from liability under the contract." Best Cartage, 219 N.C. App. at 440, 727 S.E.2d at 300-01.

With regard to the third element, the Amended Complaint alleges that the Plaintiffs lost royalty payments and profits because the Defendants breached the License Agreement. [Doc. 43 at 28]. Accordingly, the Plaintiffs' allegations, taken as true by virtue of the Defendants' default, establish that Defendant Vuillemin's control of HIE, HT, and BR caused the Plaintiffs' injury.[4]

For these reasons, the Court concludes that the Plaintiffs' factual allegations, deemed admitted by the Defendants' default, are sufficient to pierce the corporate veil of Defendants HIE, HT, and BR. Therefore, the Plaintiffs have established the individual liability of Defendant Vuillemin for the breach of the License Agreement.

---

[4] The Plaintiffs do not argue that HIE, HT, and BR feature "excessive fragmentation of a single enterprise into separate corporations." Mansfield, 1998 WL 433304, at *4. Accordingly, this factor weighs neither in favor nor against piercing the corporate veil.

**B. Trademark Claims**

The Plaintiffs' second, third, and fourth causes of action are for violations of the Lanham Act, including trademark infringement, false designation of origin, and false or misleading advertising. [Doc. 68-1 at 11; Doc. 43 at ¶ 45-66]. The Plaintiffs' eighth cause of action is for common law trademark infringement.

**1. Lanham Act Claims**

The admitted allegations in the Amended Complaint establish that the Defendants are French citizens who operate businesses in "key European markets, specifically including France[,]" and stole intellectual property from the Plaintiffs using "an IP address in France." [Doc. 43 at ¶¶ 3-6, 26, 32]. The reasonable inference to be drawn from these allegations is that the trademark infringement was committed by foreign citizens outside of the United States. The Lanham Act, however, only regulates "commerce which may lawfully be regulated by Congress." Steele v. Bulova Watch Co., 344 U.S. 280, 286 (1952). When determining if Lanham Act can be applied extraterritorially, courts examine whether: (1) the Defendants' conduct had a significant effect on United States commerce; (2) the Defendants are citizens of the United States; and (3) the issuance of an injunction would interfere

with trademark rights under the relevant foreign law.  <u>Bulova</u>, 344 U.S. at 283-86.

The first factor considers whether the Defendants conduct had a significant effect on United States commerce.  <u>Id.</u> at 283.  The Plaintiffs' admitted allegations establish that the Defendants' use of "confusingly similar" marks has caused the "Plaintiffs' clients, business associates, and members of the public, *in the United States* and elsewhere, to naturally, but mistakenly, be confused and deceived" and has led to "reputational, relationship, and economic injury" to the Plaintiffs' business in the United States.  [Doc. 43 at ¶ 13, 30, 34 (emphasis added)].   Such confusion leads to "the archetypal injury contemplated by the Act" by harming a plaintiff's "trade reputation in United States markets."   <u>Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.</u>, 682 F.3d 292, 310 (4th Cir. 2012) (citing <u>Nintendo of Am., Inc. v. Aeropower Co.</u>, 34 F.3d 246, 250 (4th Cir. 1994)). Because the admitted allegations establish that the Defendants' trademark infringement is confusing consumers and damaging the Plaintiffs' reputation in the United States, [Doc. 43 at ¶¶ 30, 34-36], the Defendants' actions had a significant effect on United States commerce.  <u>Sterling Drug, Inc. v. Bayer AG</u>, 14 F.3d 733, 746, 747 (2d Cir. 1994).

The second factor examines the citizenship of the Defendant, <u>Bulova</u>, 344 U.S. at 285-86, which is "the most significant factor in determining whether to apply the Lanham Act extraterritorially to a defendant's foreign activities." <u>Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.</u>, 955 F. Supp. 220, 227 (S.D.N.Y. 1997), <u>aff'd</u>, 152 F.3d 948 (Fed. Cir. 1998). The second factor receives such import because the "application of United States law to United States nationals abroad ordinarily raises considerably less serious questions of international comity than does the application of United States law to foreign nationals abroad." <u>E.E.O.C. v. Arabian Am. Oil Co.</u>, 499 U.S. 244, 274 (1991) (Marshall, J., dissenting). Because the Defendants in this case are French citizens, [Doc. 43 at ¶¶ 3-6], the Court is more "reluctant to extend the reach of the Lanham Act" to their conduct. <u>Aerogroup</u>, 955 F. Supp. at 226–27.

The third factor considers whether the application of the Lanham Act would interfere with trademark rights under the relevant foreign law. <u>Bulova</u>, 344 U.S. at 283-86. Courts have concluded that the Lanham Act "should not be given an extraterritorial application against foreign citizens acting under presumably valid trade-marks in a foreign country." <u>See</u> <u>Vanity Fair Mills, Inc. v. T. Eaton Co.</u>, 234 F.2d 633, 643 (2d Cir. 1956).

The Court provided the Plaintiffs with an opportunity to explain whether this dispute involves foreign trademarks and what effect, if any, this dispute will have on such trademarks. [Doc. 71]. The Plaintiffs claim that application of the Lanham Act will not conflict with any foreign trademark rights because the Defendants were licensees of the Plaintiffs' trademarks and a French court has concluded that a license exists between the Plaintiffs and the Defendants. [Doc. 72 at 6-8]. The Plaintiffs concede, however, that the Defendants have registered foreign trademarks and have appealed the French court's determination that a license for intellectual property exists between the Plaintiffs and the Defendants. [Id.].

The unresolved proceedings in the French courts "increase this Court's caution in exercising jurisdiction" over matters that could be implicated by the application of the Lanham Act. Juicy Couture, Inc. v. Bella Int'l Ltd., 930 F. Supp. 2d 489, 507 (S.D.N.Y. 2013). Because the proceedings in France regarding the ownership and status of foreign trademarks are ongoing, applying the Lanham Act here would be "fraught with possibilities of discord and conflict with the authorities of another country." Vanity Fair Mills, 234 F.2d at 647. As the Supreme Court has warned, applying the Lanham Act under such circumstances could create "interference with the sovereignty of another nation." Bulova, 344 U.S. at 281.

24

On balance, the Court concludes that the Lanham Act should not be applied extraterritorially here. While the Plaintiffs' admitted allegations establish that the Defendants' actions had a significant effect on United States commerce, the Court has significant concerns with applying the Lanham Act due to the Defendants' citizenship, the pending dispute in French court, and the foreign trademarks that may be affected by the Court's decision. Accordingly, the Court will deny the Plaintiffs' Motion for Default Judgment as to the Lanham Act claims against the Defendants and will dismiss those claims.

### 2.    Common Law Trademark Infringement

Unlike claims under the Lanham Act, common law trademark infringement claims are not limited to "commerce which may be lawfully regulated by Congress." 15 U.S.C. § 1127. Accordingly, the Plaintiffs can establish the Defendants' liability for common law trademark infringement without meeting the test for applying the Lanham Act extraterritorially. See Levy v. Adidas AG, No. CV186542PSGMAAX, 2018 WL 5942000, at *5 (C.D. Cal. Nov. 13, 2018) (refusing to dismiss a plaintiff's common law trademark infringement claim on the grounds that it failed the Lanham Act's test for extraterritorial application); IPOX Schuster, LLC v. Nikko Asset Mgmt. Co., 191 F. Supp. 3d 790, 808 (N.D. Ill. 2016) (explaining that a plaintiff

25

bringing a common law trademark infringement claim need not meet the Lanham Act's test for extraterritorial application).

The test for common law trademark infringement in North Carolina is "essentially the same" as that under the Lanham Act. <u>Georgia Pac. Consumer Prod., LP v. Von Drehle Corp.</u>, 618 F.3d 441, 449 (4th Cir. 2010). "A complainant must demonstrate that it has a valid, protectible trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." <u>Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.</u>, 43 F.3d 922, 930 (4th Cir.1995). Like federal claims under the Lanham Act, the likelihood of confusion is the "keystone" of a claim for common law trademark infringement. <u>See</u> <u>Sara Lee Corp. v. Kayser–Roth Corp.</u>, 81 F.3d 455, 462 (4th Cir.1999); <u>Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp.</u>, 148 F.3d 417, 422 (4th Cir. 1998) (stating that "[l]ikelihood of confusion" is the basic test of both common law trademark infringement and federal statutory trademark infringement.).

The Court begins by considering whether the Plaintiffs own the Herrmann Trademarks and whether the Herrmann Trademarks are valid and protectable. "At common law, trademark ownership is acquired by actual use of the mark in a given market." <u>Emergency One, Inc. v. Am. Fire Eagle Engine Co.</u>, 332 F.3d 264, 267 (4th Cir. 2003). "To acquire ownership of a

trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."  Id. (quoting Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996)). The parties use must be "deliberate and continuous, not sporadic, casual or transitory." Larsen v. Terk Techs. Corp., 151 F.3d 140, 146 (4th Cir. 1998) (quoting La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271-72 (2d Cir. 1974)).

Here, the Plaintiffs allege that "HG and its predecessors have been the sole owner of all right, title, and interest in the Herrmann Trademarks and the registration and common law rights therein."  [Doc. 43 at ¶ 20].  The Plaintiffs further allege that they have continuously used the Herrmann Trademarks in interstate and international commerce for several years, including in North Carolina. [Doc. 43 at ¶¶ 14, 21-23].  The Plaintiffs used the Herrmann Trademarks in the sale of goods and services before the Defendants because the Plaintiffs licensed the Herrmann Trademarks to the Defendants in the License Agreement.  Taking the Plaintiffs' allegations as true by virtue of the Defendants' default, the Court concludes that the

Plaintiffs own the Herrmann Trademarks and that the Herrmann Trademarks are valid and protectable.[5]

The Fourth Circuit has identified several factors to determine the likelihood of confusion, including: (1) the strength or distinctiveness of the mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. <u>Rosetta Stone Ltd. v. Google, Inc.</u>, 676 F.3d 144, 153 (4th Cir. 2012). The Fourth Circuit has recognized that these "factors are not always weighted equally, and not all factors are relevant in every case." <u>Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC</u>, 507 F.3d 252, 259-60 (4th Cir. 2007). The first factor – the strength or distinctiveness of the mark – is "'paramount' in determining the likelihood of confusion." <u>Grayson O Co. v. Agadir Int'l LLC</u>, 856 F.3d 307, 314-15 (4th

---

[5] The Plaintiffs provide federal certificates of registrations for the Herrmann Trademarks. [Docs. 43-1 through 43-16]. Although federal registration of a mark does not confer ownership rights, registration constitutes "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce . . . ." 15 U.S.C.A. § 1057(b).

Cir. 2017) (quoting Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)).

The Plaintiffs allege that the Herrmann Trademarks are distinctive and that the Plaintiffs have "acquired substantial goodwill, recognition, and fame associated with the Herrmann Trademarks among academics, clients, business associates, and members of the public." [Doc. 43 at ¶ 22, 30]. The Plaintiffs further allege that the Herrmann Trademarks "are well known among businesses and consumers in North Carolina, the United States, and abroad as those marks are recognized as identifying Plaintiffs and their goods and services." [Id. at ¶ 23]. Taking those allegations as true by virtue of the Defendants' default and drawing all reasonable inferences in the Plaintiffs' favor, the Plaintiffs have established that the "paramount" first factor gives rise to a likelihood of confusion because the Herrmann Trademarks are distinctive.

The Plaintiffs allege that the Defendants' infringing uses are similar to the Herrmann Trademarks and that the Defendants have used the actual Herrmann Trademarks. [Id. at ¶ 30, 46]. For instance, the Defendants' herrmann-europe.com domain name incorporates the entirety of the HERRMANN® Mark that is reflected in United States Trademark Registration No. 3,317,364. [Doc. 43 at ¶¶ 18, 30]. Likewise, the

29

Defendants' "HBDI Junior" application incorporates the entirety of the HBDI®
Mark that appears in United States Trademark Registration No. 3,317,363
and shares the same color scheme and a similar design as some of the
Herrmann Trademarks.  [Id. at ¶¶ 18, 46].  Given the similarities between the
Plaintiffs' intellectual property and the Defendants' infringing uses, the
Plaintiffs' accepted allegations demonstrate that the second factor gives rise
to a likelihood of confusion.

The Plaintiffs allege that the Defendants' infringing uses identify similar
goods and services as the ones identified by the Herrmann Trademarks.
[Doc. 43 at ¶¶ 30, 35, 46].  For example, the "HBDI Junior" application and
hbdi.biz domain name directly mention the Plaintiffs' HBDI assessment.
[Doc. 43 at ¶¶ 30, 46].  Moreover, the Plaintiffs allege that the Defendants'
use of the infringing marks are causing the Plaintiffs' clients to "be confused
and deceived that Defendants' websites are associated with, sponsored by,
or approved by Plaintiffs."  [Doc. 43 at ¶ 34].  Accordingly, the Plaintiffs'
accepted allegations demonstrate that the third factor gives rise to a
likelihood of confusion.

The Plaintiffs further allege that the Defendants' use of "Herrmann,"
"HBDI," and "other meta tags derived from the Herrmann Trademarks" "are
causing and are designed to cause further confusion among consumers,

vendors, and other persons searching for Plaintiffs' legitimate websites and to divert them to the websites associated with the Infringing Domain Names." [Doc. 43 at ¶ 35]. Accordingly, the Plaintiffs' accepted allegations demonstrate that the sixth factor gives rise to a likelihood of confusion.

The Plaintiffs also allege that the Defendants' continuing use of the Infringing Domain Names was done in bad faith. [Id.]. To demonstrate the Defendants' alleged bad faith, the Plaintiffs highlight that the Defendant knew that the Plaintiffs were the rightful owners of the intellectual property and nevertheless infringed on that intellectual property to capture business from entities that intended to do business with the Plaintiffs. [Id. at ¶¶ 35-36]. Accordingly, the Plaintiffs' accepted allegations demonstrate that the seventh factor gives rise to a likelihood of confusion.[6]

For these reasons, the Court finds that the Defendants' infringement on the Herrmann Trademarks creates a likelihood of confusion. Accordingly,

---

[6] The Plaintiffs have not made any allegations or presented any argument from which the Court can analyze the similarity of the facilities used by the markholders, the similarity of advertising used by the markholders, the quality of the defendant's product, or sophistication of the consuming public. Rosetta Stone, 676 F.3d at 153. Accordingly, those factors weigh neither in favor nor against finding a likelihood of confusion here.

31

the Plaintiffs have established a claim for common law trademark infringement against the Defendants.[7]

## C. Copyright Claims

The Plaintiffs' fifth cause of action is for copyright infringement. [Doc. 68-1 at 13; Doc. 43 at ¶ 67-75]. Copyright infringement occurs when a person "violates any of the exclusive rights of the copyright owner." 17 U.S.C. § 501(a). "Therefore, the two elements of an infringement claim are

---

[7] "A plaintiff can pursue a trademark infringement claim under a veil-piercing theory." Flentye v. Kathrein, 485 F. Supp. 2d 903, 914 (N.D. Ill. 2007 (citing Bally Schuhfabriken AG v. Bally Manufacturing Corp., No. 92 C 0312, 1992 WL 80554, at *2 (N.D. Ill., Apr.8, 1992) (collecting authority)). The Court has previously concluded that the Plaintiffs have presented sufficient allegations to pierce the corporate veil of Defendants HIE, HT, and BR to hold Defendant Vuillemin individually liable. Accordingly, Defendant Vuillemin can be held liable for trademark infringement.

Even without piercing the corporate veil, Defendant Vuillemin could still be held liable for trademark infringement because "a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil." Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1184 (11th Cir. 1994) (citation omitted). To be held liable for trademark infringement, a corporate official must have "actively and knowingly caused the infringement." Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1477 (11th Cir. 1991). The Plaintiffs allege that the infringement by the Defendants, including Defendant Vuillemin, was "knowing" and "willful." [Doc. 43 at ¶ 13, 36]. The Plaintiffs also allege that "Defendant Vuillemin has influenced, controlled, and dominated the acts, business, and property" of the Defendants and that he controlled the Defendants "as a conduit for the conduct of his personal business, interests, and property." [Id. at ¶¶ 105-06]. The Plaintiffs further allege that the infringement, including by Defendant Vuillemin, "has been intentional and in bad faith." [Id. at ¶ 49]. While those allegations are somewhat conclusory, they are sufficient to establish that Defendant Vuillemin "actively and knowingly caused the infringement." Chanel, 931 F.2d at 1477. Accordingly, the Plaintiffs' allegations support a common law trademark infringement claim against Defendant Vuillemin even without piercing the corporate veil of Defendants HIE, HT, and BR.

(1) ownership of a valid copyright and (2) encroachment upon one of the exclusive rights afforded by the copyright." Elektra Ent. Grp., Inc. v. Doe, No. 5:08-cv-1159-FL, 2008 WL 5111886, at *2 (E.D.N.C. Dec. 4, 2008) (citing Avtec Systems, Inc. v. Peiffer, 21 F.3d 568, 571 (4th Cir. 1994)). "A certificate of registration issued by the Copyright Office is 'prima facie evidence of the validity of the copyright and of the facts stated in the certificate,' such as ownership." Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 428 (4th Cir. 2010), as amended (Aug. 24, 2010) (citing 17 U.S.C. § 410(c)).

### 1. Defendants' Liability for Copyright Infringement

The Plaintiffs allege that the HG Copyrights are duly registered by the Copyright Office. [Doc. 43 at ¶ 68]. Taking those allegations as true by virtue of the Defendants' default, the Plaintiffs have demonstrated that they own valid copyrights.

The Plaintiffs further allege that the Defendants were provided with access to the materials incorporating the copyrighted materials and that the Defendants "infringed, directly, indirectly, contributorily, or vicariously, the Plaintiffs' Asserted Copyrights, including by continuing to use, copy, perform, display, and/or distribute, after material breach and termination of the License Agreement, materials that are identical copies of the Plaintiffs'

Asserted Copyrights or are derivative of the Plaintiffs' Asserted Copyrights." [Doc. 43 at ¶¶ 69-70]. Those factual allegations, deemed admitted by the Defendants' default, sufficiently establish that the Defendants infringed copyrights owned by the Plaintiffs.[8]

## 2. Extraterritorial Application of Copyright Act

Although the Plaintiffs have established that the Defendants infringed their copyrights, the Amended Complaint alleges that the Defendants are residents and citizens of France who operate businesses in "key European markets, specifically including France[,]" and stole intellectual property from

---

[8] Defendant Vuillemin can be held liable for copyright infringement because the Plaintiffs have pierced the corporate veil of HIE, HT, and BR. Even if Defendant Vuillemin were not personally responsible for directly infringing the Plaintiffs' copyrights, he can be held liable for vicarious copyright infringement without piercing the corporate veil of Defendants HIE, HT, and BR. "In order to establish vicarious liability, a copyright owner must demonstrate that the entity to be held so liable: (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." Nelson–Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 513 (4th Cir. 2002); see also M.G.M. Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) ("[One] infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."). The Plaintiffs allege that "Defendant Vuillemin has influenced, controlled, and dominated the acts, business, and property" of HIE, HT, and BR and that he controlled the Defendants "as a conduit for the conduct of his personal business, interests, and property." [Doc. 43 at ¶¶ 105-06]. The Plaintiffs further allege that the "profits of Defendants HIE and HT were improperly diverted to serve Defendant Vuillemin's own interests" and that HIE, HT, and BR "were maintained and used as devices to avoid individual liability and financial responsibility of Defendant Vuillemin." [Id. at ¶¶ 107-08]. While the Plaintiffs' allegations are somewhat conclusory, they are sufficient to show that Defendant Vuillemin "possessed the right and ability to supervise the infringing activity and that he possessed an obvious and direct financial interest in the infringement." Nelson–Salabes, Inc., 284 F.3d at 513. As such, the Plaintiffs' allegations, taken as true by virtue of the Defendants' default, would support a vicarious trademark infringement claim against Defendant Vuillemin even without piercing the corporate veil of Defendants HIE, HT, and BR.

34

the Plaintiffs using "an IP address in France[,]" [Doc. 43 at ¶¶ 3-6, 26, 32]. While those allegations appear to assert that the infringement was committed by foreign citizens outside of the United States, the Copyright Act "is considered to have no extraterritorial reach" unless the plaintiff can show that the "predicate-act doctrine" applies. Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 306 (4th Cir. 2012) (citing Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (2d Cir. 1988)). To invoke the predicate-act doctrine, "a plaintiff is required to show a domestic violation of the Copyright Act and damages flowing from foreign exploitation of that infringing act." Id. at 308.

"Copies" are defined in the Copyright Act as: "material objects . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. "A work is 'fixed' . . . when its embodiment . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." Id. When a person browses a website and views a document or other protected material, a copy of the document is made in the computer. See Intellectual Reserve, Inc., 75 F. Supp. 2d at 1294. Because creating such a copy constitutes copyright

infringement, "the Copyright Act fairly captures foreign uploads targeted to and downloaded by U.S. consumers." Goes Int'l, AB v. Dodur Ltd., No. 14-CV-05666-LB, 2018 WL 2298631, at *11 (N.D. Cal. May 20, 2018); Intellectual Reserve, Inc., 75 F. Supp. 2d at 1294; MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 518 (9th Cir. 1993); Marobie–Fl., Inc. v. National Ass'n of Fire Equip. Distrib., 983 F. Supp. 1167, 1179 (N.D. Ill. 1997); IMAPizza, LLC v. At Pizza Ltd., 334 F. Supp. 3d 95, 120 (D.D.C. 2018).

Before the Defendants defaulted, the Plaintiffs submitted an affidavit from Ann Herrmann-Nehdi, the Chairman of the Board of HI, stating that individuals in the United States accessed the Defendants' website and created copies of the Plaintiffs' copyrighted information. [Doc. 18-1 at ¶¶ 28-

31, 41, 44].[9]  By establishing that individuals in the United States created copies of their protected information, the Plaintiffs have established that an act of copyright infringement occurred within the United States.  Shropshire v. Canning, 809 F. Supp. 2d 1139, 1146 (N.D. Cal. 2011) (finding that a predicate act occurred when an individual in Canada uploaded copyrighted information to the internet and that information was viewed in the United States); United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F.Supp.2d 198, 224 (S.D.N.Y. 2002) (denying a motion to dismiss based

---

[9] Ordinarily, the Court is limited to the allegations in the complaint that are admitted by the Defendants' default when assessing whether the Plaintiff is entitled to a judgment by default.  To look to any evidence of liability beyond those allegations would have due process implications, since the ordinary defaulting defendant would have no opportunity to rebut additional factual allegations with which he had not been served.  In the present case, however, the Defendants are not subject to a default because they failed to answer the complaint.  The Defendants actively defended this action to the brink of trial before informing the Court that they would defend no further.  As part of that defense, the Defendants filed a motion to dismiss for lack of personal jurisdiction, asserting that they lacked sufficient forum contacts to support the exercise of personal jurisdiction.  In response to that motion, the Plaintiffs served the Defendants with the affidavit from Ann Hermann-Nehdi, which contains facts regarding the contacts between the Defendants and the United States.  Having been served with Hermann-Nehdi's affidavit, the Defendants are no doubt aware of the facts that it presents.  Therefore, this is the rare case where the Court may consider such extraneous affidavits.  Antoine v. Atlas Turner, Inc., 66 F.3d 105, 111 (6th Cir. 1995) (The "[u]se of affidavits in granting default judgments does not violate [ ] due process."); see also Frazier v. Absolute Collection Serv., Inc., 767 F. Supp. 2d 1354, 1362 (N.D. Ga. 2011); Ayers v. Receivables Performance Mgmt., L.L.C., No. 2:15-CV-12082, 2016 WL 5402962, at *5 (E.D. Mich. 2016); Gomez v. El Rancho de Andres Carne de Tres Inc., No. CV 2012-1264 CBA MDG, 2014 WL 1310296, at *2 (E.D.N.Y. Mar. 11, 2014), report and recommendation adopted, No. 12-CV-1264 CBA MDG, 2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014); Zurita v. Bergen Pizza Inc., No. 12CV3874KAMMDG, 2016 U.S. Dist. LEXIS 28170, (E.D.N.Y. Mar. 1, 2016), report and recommendation adopted, No. 12CV3874KAMMDG, 2016 WL 1089262, at *1 (E.D.N.Y. Mar. 21, 2016).

on extraterritoriality because "the allegedly infringing material was accessible from computers within the United States."). Because damages flow from the Defendants' extraterritorial exploitation of those domestic violations, the Copyright Act can be applied extraterritorially in this case. Shandong, 682 F.3d at 306.

### D. Misappropriation of Trade Secrets

The Plaintiffs' sixth cause of action is for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836(b), 1839 *et seq.* ("DTSA"), and the North Carolina Trade Secret Protection Act, N.C. Gen. Stat. § 66-152 *et seq.* ("NCTSPA"). [Doc. 68-1 at 14; Doc. 43 at ¶¶ 76-93].

To establish a misappropriation claim under the DTSA, the plaintiff must show "(1) that he holds a trade secret, (2) that the trade secret was misappropriated, and (3) that the trade secret implicates interstate or foreign commerce." Hunter Structural, P.A. v. Arp Eng'g, Inc., No. 3:17-cv-00086, 2018 WL 662367, at *5 (W.D.N.C. Feb. 1, 2018) (Mullen, J.) (citing 18 U.S.C. § 1836(b)(1)). To establish a claim for misappropriation of trade secrets under the NCTSPA, a plaintiff must "identify with sufficient specificity" both "the trade secrets [the defendants] allegedly misappropriated" and "the acts by which the alleged misappropriations were accomplished." Washburn v.

<u>Yadkin Valley Bank & Trust Co.</u>, 190 N.C. App. 315, 327, 660 S.E.2d 577, 586 (2008).

### 1. Trade Secrets

The DTSA defines a trade secret as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The NCTSPA defines a trade secret as

> business or technical information including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent, actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who

39

can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).

The Amended Complaint describes the Plaintiffs' Trade Secrets as "highly confidential, proprietary information" that includes "consulting and training techniques and tools, and related content and materials" as well as "client lists, financial and competitive data, analytical tools/techniques, and algorithms used to develop, maintain, and service new and existing clients." [Doc. 43 at ¶ 25]. The Amended Complaint further identifies the Plaintiffs' Trade Secrets as "the algorithms underlying the HBDI assessment and the scoring and interpretation of HBDI assessment results, client data consisting of and derived from HBDI assessment results, and software source code, including code for implementing the HBDI assessment and scoring and interpreting HBDI assessment results". [Id.]. The Amended Complaint alleges that the Plaintiffs have undertaken "reasonable measures to protect the secrecy of their trade secrets," including "limiting access to individuals and entities subject to duties of confidence and with a need to know specific Plaintiffs' Trade Secrets, restricting access to computer systems and physical locations where Plaintiffs' Trade Secrets are stored, and using

40

passwords and physical security measures to restrict access to Plaintiffs' Trade Secrets" and that the Plaintiffs' Trade Secrets "derive independent economic value as a result of not being generally known." [Id. at ¶¶ 77-78]. Taking the allegations of the Amended Complaint as true, the Plaintiffs have shown that their Trade Secrets are protected by the DTSA and the NCTPSA.

### 2.    Misappropriation

Under the DTSA, the "offense" at issue is the misappropriation of a trade secret.    See 18 U.S.C. § 1836(b).    The DTSA defines "misappropriation" as the improper acquisition, unauthorized disclosure, or unauthorized use of a trade secret. Id. at § 1839(5).  The NCTSPA defines misappropriation as the unauthorized "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent . . . ." N.C. Gen. Stat. § 66-152(1).

The Amended Complaint generally alleges that the Defendants disclosed the Trade Secrets to other parties and used the Trade Secrets without authorization.  [Doc. 43 at ¶¶ 79, 88].  Having established that the Defendants breached and disavowed the License Agreement, they had no further authority to access, use or disclose the Trade Secrets.  [See § V.A.1. supra].    Ann Herrmann-Nehdi filed an affidavit before the Defendants defaulted that provides greater detail, stating that the Defendants used the

Trade Secrets hundreds of times to allow users to complete HBDI Assessments and that the Defendants have disclosed the Trade Secrets to a web developer. [Doc. 18-1 at ¶¶ 28-34]. These allegations, deemed admitted, establish that the Defendants misappropriated the Trade Secrets under the DTSA and the NCTSPA.

### 3. Continued Use after May 11, 2016 Under the DTSA

The DTSA, however, only applies to misappropriations that occurred on or after it was enacted on May 11, 2016. Pub. L. No. 114–153, § 2(e), 130 Stat. 376 (2016) (emphasis added). The Plaintiffs allege that the Defendants first misappropriated the Trade Secrets in 2015 and continue to use the misappropriated Trade Secrets to the present. [Doc. 43 at ¶¶ 31, 81 (stating that the "Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm as a result of Defendants' ongoing use and/or disclosure of Plaintiffs' Trade Secrets[.]")]. Because the DTSA applies only to violations that occurred on or after May 11, 2016, the Court must determine whether the DTSA protects trade secrets that were originally misappropriated in 2015 and continue to be used after May 11, 2016.

Most courts have held that the DTSA protects trade secrets that were misappropriated before May 11, 2016 if those trade secrets continued to be used after May 11, 2016. See, e.g., Brand Energy & Infrastructure Servs.,

42

Inc. v. Irex Contracting Grp., No. CV 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017); Marimar Textiles, Inc. v. Jude Clothing & Accessories Corp., 2017 WL 4391748, at *6 (D.N.J. Oct. 2, 2017); Veronica Foods Co. v. Ecklin, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017); Sleekez, LLC v. Horton, 2017 WL 1906957, at *5 (D. Mont. Apr. 21, 2017); High 5 Games, LLC v. Marks, WL 349375, at *6 (D.N.J. Jan. 24, 2017); Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., No. 15–cv–211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016); Adams Arms, LLC v. Unified Weapon Sys., Inc., No. 16–cv–1503, 2016 WL 5391394, at *5–7 (M.D. Fla. Sept. 27, 2016). A minority of courts have held the opposite, finding that the DTSA does not allow "a misappropriation claim to be asserted based on the continued use of information that was disclosed prior to the effective date of the statute." Avago Techs. U.S. Inc. v. Nanoprecision Prod., Inc., No. 16-cv-03737-JCS, 2017 WL 412524, at *9 (N.D. Cal. Jan. 31, 2017); see also Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc., No. 15-cv-02177-SI, 2017 WL 1436044, at *5 (N.D. Cal. Apr. 24, 2017). This issue has yet to be addressed by the United States Supreme Court or the Fourth Circuit.

The Court begins with the text of the statute. The DTSA states that it applies to the "misappropriation of a trade secret . . . for which *any act* occurs on or after the date of the enactment of this Act." Pub. L. No. 114–153, §

2(e), 130 Stat. 376 (2016) (emphasis added).  Instead of simply stating that the DTSA applies to "misappropriations of trade secrets that occur after the enactment date," Congress inserted language applying the DTSA to misappropriations "for which any act occurs" after the enactment date.  Id. That qualifying language is reasonably read to extend protection to continued uses or disclosures of previously misappropriated trade secrets. Because the Plaintiffs' admitted allegations establish that the Defendants have continued to use the trade secrets after May 11, 2016, the DTSA applies to those subsequent acts.

The answer would be different under the Uniform Trade Secrets Act ("UTSA"), the model for several state laws that protect trade secrets.  In Brand Energy, the Eastern District of Pennsylvania highlighted that the UTSA expressly "does not apply to a misappropriation occurring prior to the effective date" and does not apply to a misappropriation that continues "after the effective date."  2017 WL 1105648, at *3 (citations omitted).  The DTSA, however, contains no such provision.  Id.  According to the reasoning from Brand Energy, the decision to omit the UTSA's limiting provision from the DTSA suggests that Congress wanted the DTSA to apply to misappropriated trade secrets that continued to be used after the effective date.  Id.  This

analysis from <u>Brand Energy</u> persuasively leads to the conclusion that the DTSA applies to such continued use.

Based on the foregoing, the Court concludes as a matter of law that the continued use of trade secrets after May 11, 2016 can serve as the basis for a DTSA claim, even if those trade secrets were originally misappropriated before May 11, 2016.

### 4. Interstate or Foreign Commerce Under the DTSA

The DTSA requires that the trade secrets have been used in interstate or foreign commerce. <u>Hunter Structural, P.A. v. Arp Eng'g, Inc.</u>, No. 3:17-cv-00086, 2018 WL 662367, at *5 (W.D.N.C. Feb. 1, 2018) (Mullen, J.) (citing 18 U.S.C. § 1836(b)(1)). The Amended Complaint alleges that the Defendants conduct their business in "both interstate and international commerce" and that the Defendants have used the Trade Secrets while conducting business in France, the United States, and elsewhere. [Doc. 43 at ¶¶ 20, 26, 35]. Taking the Plaintiffs' allegations as true by virtue of the Defendants' default, the Defendants' use of the Plaintiffs' Trade Secrets implicates interstate and international commerce. 18 U.S.C. § 1836(b)(1)).[10]

_____

[10] Even without piercing the corporate veil of HIE, HT, and BR, Defendant Vuillemin can be held liable for the DTSA and NCTSPA claims because "[a] corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation." <u>Polo Fashions, Inc. v. Craftex, Inc.</u>, 816 F.2d 145, 149

45

Accordingly, the Plaintiffs have established claims against the Defendants under the DTSA.

### 5. Extraterritorial Application of the DTSA

An extraterritorial claim can be brought under the DTSA only if "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837; see also Motorola Sols., Inc. v. Hytera Commc'ns Corp., 436 F. Supp. 3d 1150, 1157-68 (N.D. Ill. 2020) (collecting cases analyzing the extraterritorial application of the DTSA). Misappropriation "can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use." Motorola Sols., Inc.., 436 F. Supp. 3d at 1163 (citing Zaccari v. Apprio, Inc., 390 F. Supp. 3d 103, 112-13 (D.D.C. 2019)).

The Plaintiffs argue that the affidavit submitted by Ann Herrmann-Nehdi prior to the Defendants' default establishes that the Defendants committed at least two acts in furtherance of the offense in the United States in that the Defendants (1) used the Trade Secrets to allow individuals in the United States to take the HBDI assessment and (2) disclosed the Trade

---

(4th Cir. 1987); Sit-Set, A.G. v. Universal Jet Exch., Inc., 747 F.2d 921, 929 (4th Cir. 1984) ("Corporate officers may of course be liable jointly and severally with their corporation for obligations arising out of tortious conduct of the officers that subject the corporation to liability.")).

Secrets to a web developer located in Florida. [Doc. 18-1 at ¶¶ 28-35].[11] Those acts are sufficient to establish that "an act in furtherance" of the "disclosure" and "use" of the Trade Secrets occurred in the United States. Accordingly, the DTSA can be applied to the conduct at issue here.

For these reasons, the Plaintiffs' allegations support a claim for misappropriation of trade secrets against the Defendants under both North Carolina and federal law.

### E.    Tortious Interference

The Plaintiffs' seventh cause of action is for tortious interference with contract and tortious interference with prospective economic advantage. [Doc. 68-1 at 16; Doc. 43 at ¶¶ 94-99]. Tortious interference with existing contracts and tortious interference with prospective economic advantage are two distinct torts under North Carolina law. Irwin Indus. Tool Co. v. Worthington Cylinders Wisconsin, LLC, No. 3:08-cv-00291, 2010 WL 565251, at *4 (W.D.N.C. Feb. 12, 2010) (Reidinger, J.).

### 1.    Interference with Contract

Under North Carolina law, a claim for tortious interference with contract must allege: (1) a valid contract between the plaintiff and a third person

_____

[11] Nehdi's Affidavit indicates that these acts began before May 11, 2016 (the date the DTSA was enacted) and continued thereafter. [Id.].

47

exists; (2) the defendant knows of this contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) the defendant's acts were committed without justification; and (5) the plaintiff suffered actual damage. Barker v. Kimberly-Clark Corp., 136 N.C. App. 455, 462, 524 S.E.2d 821, 826 (2000).

Ordinarily, a plaintiff must show that an "outsider" interfered with its contractual relations with a third party to establish a typical claim for tortious interference with contract. See Varner v. Bryan, 113 N.C. App. 697, 701–02, 440 S.E.2d 295, 298 (1994) (reciting elements). The Defendants were not, however, outsiders to the contracts at issue here. Instead, as the Plaintiffs allege, the Defendants were involved in the contractual agreements and the business relationships in which they allegedly interfered. [Doc. 43 at ¶ 95-97]. As such, the Plaintiffs can only establish a claim for tortious interference with contract by showing that the Defendants acted with "legal malice" by committing "a wrongful act or exceed[ing] [their] legal right or authority in order to prevent the continuation of the contract between the parties." Varner, 133 N.C. App. at 702, 440 S.E.2d at 298; Kwan–Sa You v. Roe, 97 N.C. App. 1, 387 S.E.2d 188 (1990). The Plaintiffs must also show that the Defendants acted without any legal justification for their actions. Id.

(citing <u>Childress v. Abeles</u>, 240 N.C. 667, 674, 84 S.E.2d 176, 181-82 (1954)).

The Plaintiffs allege that they "have had ongoing. . . contractual relationships" with clients, including UCB. [Doc. 43 at ¶ 95]. The Plaintiffs further allege that the Defendants were aware of those contractual relationships. [<u>Id.</u> at ¶ 36]. The Plaintiffs further allege that the Defendants interfered with those contractual relationships by intentionally misdirecting the Plaintiffs' clients to the server that the Defendants seized from the Plaintiffs. [<u>Id.</u> at ¶ 32]. According to the Plaintiffs' allegations, the Defendants' unauthorized takeover of the server caused the Defendants to be "deprived of access to data entered by users." [<u>Id.</u> at ¶ 35]. Moreover, by redirecting the Plaintiffs' clients to the server controlled by the Defendants, the Defendant caused those clients to "be confused and deceived that Defendants' websites are associated with, sponsored by, or approved by Plaintiffs." [<u>Id.</u> at ¶ 34]. Taking the Plaintiffs' allegations as true by virtue of the Defendants' default, they establish that the Defendants caused those contracted parties not to perform aspects of their contracts with the Plaintiffs.

The Plaintiffs further allege that the Defendants' acts were "wrongful" and were committed without privilege or justification. [<u>Id.</u> at ¶ 98]. The Plaintiffs further allege that they suffered actual damage as a result of the

49

Defendants' interference. [Id. at ¶ 99]. Accordingly, the Plaintiffs have established a claim for tortious interference with contract against the Defendants.

## 2. Interference with Prospective Economic Advantage

Under North Carolina law, a claim for tortious interference with prospective advantage must allege that the defendant acted "without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" Walker v. Sloan, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000) (quoting Cameron v. New Hanover Memorial Hospital, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)).

The Plaintiffs allege that the Defendants took over a server that ordinarily would have provided the Plaintiffs with access to user and client contacts. [Doc. 43 at ¶ 32]. The Plaintiffs allege that those wrongful actions interfered with the Plaintiffs' prospective contractual relations by depriving them of client contacts that would have been obtained from the server. [Id. at ¶¶ 97-98]. Accordingly, the Plaintiffs have established a claim for tortious interference with prospective economic advantage against the Defendants.[12]

---

[12] Although the Court has concluded that the Plaintiffs may pierce the corporate veil of HIE, HT, and BR to hold Defendant Vuillemin directly liable on the tortious interference

## F. Damages

Having established that the Defendants can be held liable for breach of contract, copyright infringement under the Copyright Act, common law trademark infringement, misappropriation of trade secrets under the DTSA and the NCTPSA, tortious interference with contract, and tortious interference with prospective economic advantage, the Court turns to the Plaintiffs' request for damages.

### 1. Unpaid Royalties

The Plaintiffs seek to recover $723,401.16 in royalties that the Defendants allegedly failed to pay under the License Agreement. [Doc. 43 at 28; Doc. 68-1 at 20]. To support that request, the Plaintiffs submit evidence showing that the License Agreement required the Defendants to pay royalties of 8% on book sales; 20% on sales of a game created by the Plaintiffs; and 6% on all other sales. [Doc. 69-13 at 20; Doc. 52-1 at 9; Doc. 52-2 at 18]. The Plaintiffs also submit a report from John Beck, a certified public accountant, who calculates that the Defendants owed the Plaintiffs

---

claims, [Doc. 68-1 at ¶ 18], Defendant Vuillemin can be held liable for tortious interference without piercing the corporate veil because "[a] corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation." Polo Fashions, 816 F.2d at 149. Because the Plaintiffs allege that Defendant Vuillemin committed these tortious actions on behalf of HIE, HT, and BR, [Doc. 43 at ¶ 110], the Plaintiffs have established claims for tortious interference with contract and prospective economic advantage against Defendant Vuillemin.

$645,051.00 in unpaid royalties through the end of 2018. [Doc. 69-13 at 11]. The Plaintiffs also submit invoices showing that the Defendants have failed to pay $78,350.16 in royalties for 2019. [Doc. 69-15 at 2].

"As a general rule, the injured party in a breach of contract action is awarded damages which attempt to place the party, insofar as possible, in the position he would have been in had the contract been performed." See Strader v. Sunstates Corp., 129 N.C. App. 562, 571, 500 S.E.2d 752, 757 (1998) (citation omitted). That amount includes unpaid royalties. Meineke Car Care Cts., Inc. v. RLB Holdings, LLC, 423 F. App'x 274, 281 (4th Cir. 2011) (allowing for recovery of unpaid royalties); Maaco Franchisor SPV, LLC v. Cruce, No. 3:18-cv-00361, 2019 WL 5295702, at *5 (W.D.N.C. Oct. 18, 2019) (Cogburn, J.) (same).

Here, the Plaintiffs allege that the Defendants breached the License Agreement when they disavowed their contractual responsibilities in late 2015. [Doc. 43 at ¶ 32; Doc. 69-13 at 20; Doc. 52-1 at 9; Doc. 52-2 at 18]. According to the Plaintiffs' allegations, the Defendants' breach constituted a repudiation and termination of the License Agreement. [Doc. 43 at ¶¶ 38; 43; 70]. The Plaintiffs, however, seek unpaid royalties that accrued after the Defendants allegedly breached the contract in 2015. [Doc. 43 at ¶ 4; Doc. 68-1 at 20]. On a breach of contract claim, the Court cannot award unpaid

royalties that were accrued after the contract was terminated. Accordingly, the Court will award the Plaintiffs the unpaid royalties that accrued prior to the breach of contract in 2015 on their breach of contract claim.

With regard to the post-breach unpaid royalties, the DTSA allows the Court to award "a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret[.]" 18 U.S.C. § 1836(b)(3)(B). The Copyright Act also allows the Court to award a reasonable royalty for copyright infringement. Gaylord v. United States, 777 F.3d 1363, 1367 (Fed. Cir. 2015) (citations omitted); 17 U.S.C. § 504(b)).[13]

Here, the Plaintiffs' establish that the Defendants continued to use the Trade Secrets and the HG Copyrights after breaching and disavowing the License Agreement in 2015. [Doc. 43 at ¶¶ 31, 69-70, 81]. Therefore, the Plaintiffs are entitled to a reasonable royalty for the Defendants' unauthorized use of their intellectual property following the breach of the License Agreement. 17 U.S.C. § 504(b); 18 U.S.C. § 1836(b)(3)(B).

The DTSA is silent on what qualifies as a "reasonable royalty" for the use of a misappropriated trade secret. 18 U.S.C. § 1836(b)(3)(B)(ii).

---

[13] Damages under the Copyright Act are available only for infringement that occurred "three years back from the time of suit." Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 677 (2014) (citing 17 U.S.C. § 507(b)). The Plaintiffs filed this action on March 7, 2017. [Doc. 1]. Accordingly, all damages arising from the copyright infringement occurring between the breach in 2015 and the filing of this action are available to the Plaintiffs.

53

Because the Fourth Circuit has not addressed the issue, "courts within the Fourth Circuit have turned to University Computing Co. v. Lykes–Youngstown Corp., 504 F.2d 518 (5th Cir. 1974), which 'is a leading case on calculating a reasonable royalty.'" Steves & Sons, Inc. v. JELD-WEN, Inc., No. 3:16-CV-545, 2018 WL 2172502, at *7 (E.D. Va. May 10, 2018) (quoting Check 'n Go of Va., Inc. v. Laserre, No. CIV.A.6:04 CV 00050, 2005 WL 1926609, at *5 (W.D. Va. Aug. 9, 2005)).  According to University Computing, "a reasonable royalty is simply that amount which the trier of fact estimates a person desiring to use a trade secret would be willing to pay for its use and a trade secret owner desiring to license the trade secret would be willing to accept."  Id. at *8 (citing Univ. Computing, 504 F.2d at 537 n.31) (brackets omitted).

The Copyright Act also does not provide a definition for a reasonable royalty.  17 U.S.C. § 504(b).  According to the Federal Circuit, a court calculating a reasonable royalty under the Copyright Act "may hypothesize a negotiation between the parties before the infringement occurred and determine the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer."  Gaylord, 777 F.3d at 1367 (citations and quotations omitted).

Here, the Court does not need to engage in speculation regarding the reasonable fee that a hypothetical buyer and seller would have negotiated for the use of the Plaintiffs' intellectual property. The Plaintiffs have established that the parties negotiated the royalties and that the Defendants paid those royalties under the License Agreement for several years. [Doc. 43 at ¶¶ 12, 27-29, 38; Doc. 69-13 at 20; Doc. 52-1 at 9; Doc. 52-2 at 18]. Based on those established facts, the Court concludes that the royalties set forth in the License Agreement are reasonable for the purpose of calculating the Plaintiffs' damages under the DTSA and the Copyright Act. Accordingly, the Court will award the Plaintiffs unpaid royalties under the DTSA and the Copyright Act for the Defendants continued use of the Trade Secrets and the HG Copyrights following the breach of the License Agreement in late 2015.

The Plaintiffs' evidence establishes that the Defendants have failed to pay $723,401.16 in royalties between 2011 to 2019. [Doc. 68-1 at 20; Doc. 69-13 at 11]. Accordingly, the Plaintiffs will recover $723,401.16 jointly and severally from the Defendants.

## 2. Lost Profits

The Plaintiffs seek to recover $2,447,820 in profits that were allegedly lost due to the Defendants' breach of contract and misappropriation of the Plaintiffs' intellectual property. [Doc. 68-1 at 21].

"Damages for breach of contract may include loss of prospective profits where the loss is the natural and proximate result of the breach." Mosley & Mosley Builders v. Landin Ltd., 87 N.C. App. 438, 446, 361 S.E.2d 608, 613 (1987) (citation omitted). The party seeking to recover lost profits has the burden of proving such losses with "reasonable certainty." Olivetti Corp. v. Ames Business Systems, Inc., 319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987). Although absolute certainty is not required, damages for lost profits will not be awarded based on hypothetical or speculative forecasts. Mosley, 87 N.C. App. at 446, 361 S.E.2d at 613 (when prospective profits are conjectural, remote, or speculative, they are not recoverable).

The Plaintiffs' CEO, Karim Nehdi, claims that the Defendants' breach of contract and seizure of the server resulted in customer confusion that caused the Plaintiffs to experience a significant decline in sales and lost profits beginning in 2014. [Doc. 54-2; Doc. 69-16]. To show the Plaintiffs' lost profits, Nehdi created the following chart detailing the number of profiles created by the Plaintiffs' key clients in each year between 2011 and 2016:



[Doc. 69-16]. Extrapolating from the Plaintiffs' annual growth between 2011 and 2013, Nehdi calculates that the Plaintiffs lost $2,447,820 in profits between 2014 and 2016. [Id.].

The Plaintiffs' estimation of their lost profits presents several problems. To begin, while the Plaintiffs allege that the Defendants breached the contract and seized the server in late 2015, [Doc. 43 at ¶ 32; Doc. 69-13 at 20; Doc. 52-1 at 9; Doc. 52-2 at 18], Nehdi calculates the Plaintiffs' lost profits beginning in 2014. [Doc. 69-16]. The Plaintiffs have failed to establish that the Defendants' actions impacted their profits in 2014. Indeed, the Plaintiffs' allege that the Defendants' conduct did not become erratic until after the parties' negotiations faltered in 2015. [Doc. 43 at ¶ 29]. It makes little sense to include 2014 in the Plaintiffs' lost profits when the Plaintiffs have only established that the Defendants actions began to affect those profits in 2015.

57

Moreover, Nehdi's calculation appears to ignore the significant decrease in business from IBM beginning in 2014. From 2011-2013, IBM was the Plaintiffs' largest client and was responsible for the majority of profiles being created. [Id.]. In 2014, however, IBM created only 10% as many profiles as it had in 2013. [Id.]. Because IBM was the Plaintiffs' largest client, the Plaintiff's profile creation total decreased by more than 50% in 2014. [Id.]. IBM's profile creation has remained far below 2011-2013 levels since 2014. [Id.]. The Plaintiffs provide no explanation for IBM's decision to decrease its business in 2014, more than a year before the Defendants breached the contract or seized the server. While Nehdi contends that "[t]he confusion created by the separation of the database . . . was a big factor in the decrease in the profile volumes for Nestle," [Doc. 54-2 at 9], he provides no explanation for IBM's decreased business or how IBM's decision may have been linked to any of the Defendants' actions.

Finally, Nehdi's calculations project the lost profits based on the Plaintiffs' annual growth from 2011-2013. The Plaintiffs do not explain why they project annual growth using their three best years while ignoring 2014, the year that Plaintiffs lost much of IBM's business and saw their business contract by 50%. As discussed, the Plaintiffs have presented nothing to show that the downturn in 2014 is attributable to the Defendants. The

58

Plaintiffs' failure to account for the loss of half of their business prior to the Defendants' wrongful conduct, and their attempt to project annual growth based on the years before losing that business, renders their estimation of their lost profits speculative and conjectural.

In sum, the Plaintiffs have proffered insufficient evidence to establish that their lost profits are attributable to the Defendants' actions. While the Plaintiffs' evidence shows an established history of consistent profits between 2011 and 2013, the Court cannot conclude on this record that the Defendants are responsible for the Plaintiffs' lost profits from 2014 to 2016 when accounting for the unexplained loss of IBM's business prior to the breach of contract or the seizure of the server. Because the Plaintiffs have failed to carry their burden to show that they were reasonably certain to make profits they seek if not for the Defendants' wrongful conduct, the Court cannot award lost profits here.[14]  Olivetti, 319 N.C. at 546, 356 S.E.2d at 585. Accordingly, the Plaintiffs' request for lost profits will be denied.

_____

[14] Moreover, the issue of the proper amount of lost profits is complicated by the fact that the Plaintiffs earn revenue, at least in part, by receiving royalties for the use of their products. Those royalties, together with their other sources of revenue, comprise the gross revenue from which the Plaintiffs derive their net profit after the payment of expenses. The Court has already awarded damages to the Plaintiffs based on their loss of royalties, and thus the Plaintiffs have already been compensated for this element of their gross revenue (without any deduction for attendant expenses). Therefore, even if the Plaintiffs were able to calculate an actual lost profit, at least some of that calculation would effectively be a double counting of  the portion of that profit derived from those royalties.

59

### 3.  Permanent Injunction

The Plaintiffs seek a permanent injunction enjoining the Defendants from infringing the Plaintiffs' trademarks and copyrights; using or disclosing the Plaintiffs' Trade Secrets; claiming an affiliation with the Plaintiffs, Ned Herrmann, or his work; and requiring the Defendants to transfer to the Plaintiffs all trademark registrations, domain names, and domain registrations that are covered by or are confusingly similar to the Herrmann Trademarks.  [Doc. 68-1 at 22].

The Court has the power to issue a permanent injunction under the Copyright Act, 17 U.S.C. § 502(a), the DTSA, 18 U.S.C. § 1836(b)(3)(A), the NCTPSA, N.C. Gen. Stat.  § 66-154, and the common law.  Dresser-Rand Co. v. Virtual Automation Inc., 361 F.3d 831, 847 (5th Cir. 2004); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959).  To obtain a permanent injunction, the Plaintiffs must show that (1) they have suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between plaintiffs and defendants, remedy in equity is warranted; and (4) public interest would not be disserved by permanent injunction.  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citations omitted).

The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" Id.

First, the Plaintiffs have established an irreparable injury. "Irreparable injury is presumed when a plaintiff succeeds on the merits." UMG Recordings, Inc. v. Blake, No. 5:06-cv-00120-BR, 2007 WL 1853956, at *3 (E.D.N.C. June 26, 2007) (citing Sony Music Entm't, Inc. v. Global Arts Prods., 45 F.Supp.2d 1345, 1346 (S.D. Fla. 1999)). Likewise, "a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement case." Scotts Co. v. United Industries Corp., 315 F.3d 264, 271 (4th Cir. 2002). The likelihood of future copyright infringement can also constitute an irreparable injury. Capitol Records, LLC v. McEwan, No. 5:08-cv-00473-BR, 2009 WL 103611, at *3 (E.D.N.C. Jan. 13, 2009). Here, the Plaintiffs have prevailed on the merits and have shown that the Defendants' infringement has caused consumer confusion. [Doc. 18-1 at ¶¶ 26-28, 41-42, 44; Doc. 43 at ¶ 34]. Moreover, the Plaintiffs have also shown that they are likely to continue suffering injury without a permanent injunction due to the Defendants' continued infringement on the Plaintiffs' intellectual property. [Doc. 43 at ¶ 34]. Because the Plaintiffs have prevailed on the merits, demonstrated a likelihood of consumer confusion, and shown that they are

likely to continue to suffer injury without a permanent injunction, they have shown that irreparable harm exists here. <u>UMG Recordings</u>, 2007 WL 1853956, at *3 (citation omitted); <u>Scotts</u>, 315 F.3d at 271.

Second, the Plaintiffs have shown that money damages alone are insufficient to compensate for the Plaintiffs' injury. The Plaintiffs allege that the Defendants are continuing to infringe on their intellectual property and are continuing to use the Trade Secrets. [Doc. 43 at ¶¶ 35-36, 81, 90]. "Monetary damages [are] inadequate where the defendant poses a significant threat of future infringement." <u>See</u> <u>Broad. Music, Inc. v. Prana Hosp., Inc.</u>, 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016) (citation omitted); <u>Sony BMG Music Entm't v. Robinson</u>, No. 5:08-cv-00474-BR, 2009 WL 10689624, at *3 (E.D.N.C. July 6, 2009) (stating that "[t]he remedy available at law for this injury, monetary damages, will only compensate for [d]efendant's one-time infringement . . . and not for inevitable future transfers").[15] Moreover, the Plaintiffs contend that the Defendants will be unable to satisfy a monetary judgment, [Doc. 68-1 at 24], further indicating that monetary damages may be inadequate and injunctive relief may be

---

[15] The damages award based on reasonable royalties is only through the current time and does not include damages for any future royalties, as such an award would be speculative as to the extent the Defendants may misappropriate or use the Plaintiffs' intellectual property in the future. Hence, an award of monetary damages cannot compensate for such future losses.

necessary.  See Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1156-57 (Fed. Cir. 2011) (finding that the district court erred by failing to consider the possibility that the defendant would be unable to pay a monetary judgment when considering whether an injunction should be imposed). Accordingly, the Plaintiffs have shown that money damages are an inadequate remedy here.

Third, the Plaintiffs also have shown that the balance of harms favors them.  By virtue of the Defendants' default, the Defendants have not identified any harms they might suffer as a result of the issuance of a permanent injunction. The Defendants have no cognizable right to conduct their business with the unlawful use of the Plaintiffs' intellectual property. While the Defendants' business may be diminished by being unable to sell their products using the Plaintiffs' intellectual property, it would be unfair to force the Plaintiffs to compete against their own intellectual property and Trade Secrets.  Accordingly, the balance of harms is in the Plaintiffs' favor.

Finally, the public interest will be served by granting injunctive relief here.  An injunction will serve the public interest by limiting consumer confusion.  Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 939 (4th Cir.1995) (holding that an injunction in a trademark infringement case "would serve the public interest by preventing future

63

consumers from being misled").  Moreover, the public has a strong interest in protecting intellectual property rights.  EMI Apr. Music Inc. v. Rodriguez, 691 F. Supp. 2d 632, 635 (M.D.N.C. 2010).  Accordingly, an injunction will serve the public interest.

For these reasons, all four factors weigh in favor of imposing a permanent injunction here.  Accordingly, the Court will enter a permanent injunction enjoining the Defendants, acting individually or in concert with other people or entities or acting directly or indirectly, from infringing the Plaintiffs' trademarks and copyrights; using or disclosing the Plaintiffs' Trade Secrets; or claiming an affiliation with the Plaintiffs, Ned Herrmann, or his work.  The permanent injunction will further require the Defendants to transfer to the Plaintiffs all trademark registrations, domain names, and domain registrations that are covered by or are confusingly similar to the Herrmann Trademarks.

### 4.    Declaratory Judgment

The Plaintiffs seek a declaratory judgment "declaring that the parties' License Agreement is terminated as result of Defendants' material breach and disavowal of that contract and that the Herrmann Trademarks, Plaintiffs' Copyrights, and Plaintiffs' Trade Secrets all belong to Plaintiffs and that

Defendants have no ownership or interest in the same." [Doc. 43 at 28; Doc 68-1 at 25].

The Federal Declaratory Judgment Act provides that a federal district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has "repeatedly characterized the Declaratory Judgment Act as 'an enabling act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" Wilton v. Seven Falls Co., 515 U.S. 277, 284 (1995) (quoting Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 (1952)). As such, the decision to entertain a declaratory judgment action is left to the sound discretion of the Court. Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (quoting Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 (1952)).

The Fourth Circuit has explained that a "declaratory judgment action is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256 (4th Cir.1996) (quoting Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 324 (4th Cir. 1937)).

Here, the Plaintiffs have brought claims related to the Defendants' misuse of the Plaintiffs' intellectual property and the Defendants' breach of the License Agreement. The Plaintiffs have prevailed on each of those claims. Having found the Defendants liable for misusing and misappropriating the Plaintiffs' intellectual property, the Court has necessarily concluded that the Defendants do not own the Plaintiffs' intellectual property, including the Herrmann Trademarks, the HG Copyrights, or the Plaintiffs' Trade Secrets. Accordingly, there is no need to clarify that the Plaintiffs own the Herrmann Trademarks, the HG Copyrights, or the Trade Secrets. Likewise, having found the Defendants liable for breach of contract, the Court has necessarily concluded that a valid and enforceable agreement existed and that the Defendants breached and repudiated that agreement. Accordingly, there is no dispute that a valid contract existed between the parties and that the Defendants breached that contract.

While the Plaintiffs seek a declaratory judgment stating that the License Agreement between the parties is terminated as a result of the Defendants' breach, the record before the Court does not contain the complete License Agreement and does not show that a breach of the License Agreement results in termination. Moreover, the record says nothing about

66

how the termination of the License Agreement contract may alter the parties' rights and responsibilities beyond the contract. Considering the ongoing proceedings in French courts, a declaratory judgment that may affect the parties' rights and responsibilities on a limited record appears to be particularly inappropriate. Accordingly, the Court, in its discretion, will deny the Plaintiffs' request for a declaratory judgment.

## H. Attorneys' Fees

In addition to damages, the Plaintiffs seek attorneys' fees under the Copyright Act, the DTSA, and the NCTSPA. [Doc. 68-1 at 26].

### 1. Copyright Act

The Copyright Act provides that a district court "may . . . award a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. Courts in the Fourth Circuit consider the following factors when determining whether to award fees under the Copyright Act: (1) the motivation of the parties; (2) the objective reasonableness of the legal and factual positions advanced; (3) the need in the case at hand to either compensate or deter; and (4) any other relevant factors presented. Quantum Systems Integrators, Inc. v. Sprint Nextel Corp., 338 F. App'x 329, 337 (4th Cir. 2009) (citation omitted).

While the Defendants' legal positions do not appear to have been unreasonable, the Defendants spent roughly three years vigorously

67

defending this case by filing multiple dispositive motions, asserting counterclaims, and requesting discovery from the Plaintiffs. Those actions caused the Plaintiffs to incur significant expenses. The Defendants, moreover, waited until the eve of trial to notify the Court that they would not appear for trial and would no longer defend this action, purposefully defaulting. The Defendants' notification came so late that the Plaintiffs were forced to spend time and money preparing for trial. Further, the Amended Complaint alleges that the Defendants' use of the HG Copyrights was willful, extensive, and continues to this day. [Doc. 43 at ¶ 13, 71]. Based on the Defendants' unreasonable conduct during this litigation and their willful, extensive, and continuing infringement on the Plaintiffs' intellectual property rights, the Court finds that an award of attorneys' fees under the Copyright Act is appropriate here.

### 2.    DTSA and NCTSPA

Under the DTSA and the NCTSPA, a defendant who is found to have willfully and maliciously misappropriated trade secrets can held be liable for attorneys' fees. 18 U.S.C. § 1836(b)(3)(C); N.C. Gen. Stat. § 66-154(d). Here, the Amended Complaint alleges that the Defendants "willfully and maliciously misappropriated" the Plaintiffs' Trade Secrets. [Doc. 43 at ¶¶ 84, 93]. The Plaintiffs further allege that the Defendants intentionally breached

the License Agreement under which they obtained the Trade Secrets and have since been using and disclosing the Trade Secrets without authorization and with the knowledge that doing so was a violation of the Plaintiffs' intellectual property rights. [Id. at ¶¶ 29, 79, 88]. Those allegations, taken as true by virtue of the Defendants' default, establish that the Plaintiffs are entitled to attorneys' fees under the DTSA and the NCTPSA.

### 3. Reasonableness of Fee Request

Although the Plaintiffs are entitled to attorneys' fees under the Copyright Act, the DTSA, and the NCTSPA, that fee award must be reasonable. "The starting point for establishing the proper amount of an award is the number of hours reasonably expended, multiplied by a reasonable hourly rate." Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 174 (4th Cir. 1994). The burden is on the fee applicant to justify the reasonableness of the requested fee. Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984).

Here, the Plaintiffs have provided hundreds of pages of billing records, attorney bios, and a Declaration from Courtland Merrill to support their request for attorneys' fees. The Merrill Declaration provides the names and billing rates of the attorneys and paralegals who worked on the case for Stoel

Rives LLP;[16] Anthony Ostlund Baer & Louwagie P.A.; and Nelson Mullins Riley & Scarborough LLP. [Doc. 69]. The Merrill Declaration attests that Courtland Merrill incurred 697.5 hours of work on this case, and that "other Anthony Ostlund attorneys and paralegals" incurred 222 hours. [Id. at 6]. The Merrill Declaration does not, however, provide the number of hours that each of the other attorneys and paralegals incurred on this case. Instead, the Plaintiffs submitted hundreds of pages of billing records detailing the hours expended by the various attorneys. The Court will not expend judicial resources going through the records submitted by the Plaintiffs to calculate the hours incurred by each of their attorneys. United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Instead, the Court will allow the Plaintiffs to file a new request for attorneys' fees that properly sets out the basis for the requested fee award.

Even if the Court tried to calculate the hours incurred by each attorney, it would be unable to award fees on the current record. The Plaintiffs submitted records that include several time entries labeled as "Discounted/Reflects time not charged." [See Doc. 69-2 at 11-12 (Including

---

[16] Brian Park and Nathan Burnette were originally listed as counsel of record for the Plaintiffs until they withdrew from the case on July 12, 2019. [Doc. 41].

$750.00 in time labeled as "Discounted/Reflects time not charged" on the December 17, 2016 invoice); Doc. 69-1 at 2 (including the entire December 17, 2016 invoice, including the time labeled as "Discounted/Reflects time not charged," in the summary of the Plaintiffs' requested attorneys' fees and costs)].  A fee that would not be billed to a client cannot be recovered in a fee award.  See Hensley v. Eckerhart, 461 U.S. 424, 434 (1983) ("'Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.'") (quoting Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc)).  The record provided by the Plaintiffs is entirely unclear as to whether those fees were discounted or charged to the client at all.

The Court further notes that the Plaintiffs seek to recover for time incurred for paralegal work.  [Doc. 69-2 at 89, 90, 92-94, 97, 102-08, 113-120, 123-130, 132].  Paralegal work can only be recovered as attorneys' fees if the work is legal rather clerical. Vela v. City of Houston, 276 F.3d 659, 681 (5th Cir. 2001).  The Plaintiffs provide no evidence from which the Court can determine if the paralegals' work in this case was legal or merely clerical.

Moreover, the Court is guided by the following factors when awarding attorneys' fees:

> (1) the time and labor expended; (2) the novelty and
> difficulty of the questions raised; (3) the skill required

71

> to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Grissom v. The Mills Corp., 549 F.3d 313, 321 (4th Cir. 2008) (quoting Spell v. McDaniel, 824 F.2d 1380, 1402 n.18 (4th Cir. 1987)).  The Plaintiffs, however, have provided no argument or evidence regarding most of those factors.  Accordingly, the Plaintiffs' request for attorneys' fees will be denied without prejudice subject to the Plaintiffs filing an adequate motion that provides a breakdown of the hours incurred by each attorney and paralegal (deducting any discounts or hours that were not billed to the client) and discusses the relevant factors for determining the reasonableness of a fee request in the Fourth Circuit.  See Grissom, 549 F.3d at 321.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiffs' Motion for Default Judgment [Doc. 68] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) The Motion is **GRANTED** as to the Defendants' liability on the Plaintiffs' claims for breach of contract; trademark infringement under the common law; copyright infringement under the Copyright Act; trade secret misappropriation under the DTSA; trade secret misappropriation under the NCTSPA; tortious interference with contract; and tortious interference with prospective economic advantage. The Plaintiffs shall have and recover a judgment of $723,401.16, jointly and severally, from Herrmann International Europe, Herrmann Technologie, Brain Ressources, and Lionel Marc Vuillemin.

(2) The Motion is **DENIED** as to the Defendants' liability on the Plaintiffs' claims under the Lanham Act.

(3) The Motion is **DENIED WITHOUT PREJUDICE** with respect to the Plaintiffs' request for attorneys' fees.

**IT IS FURTHER ORDERED** that the Defendants, acting individually or in concert with other people or entities or acting directly or indirectly, are hereby enjoined from infringing on the Plaintiffs' trademarks and copyrights; using or disclosing the Plaintiffs' Trade Secrets; or claiming an affiliation with the Plaintiffs, Ned Herrmann, or his work. The Defendants shall transfer to the Plaintiffs all trademark registrations, domain names, and domain

registrations that are covered by or are confusingly similar to the Herrmann

Trademarks.

**IT IS SO ORDERED.**

Signed: March 6, 2021

Martin Reidinger
Chief United States District Judge